# THE STATE OF TEXAS V. STANDARD OIL COMPANY ET AL.

No. 7162.   Decided June 16, 1937.
Rehearing overruled December 1, 1937.
(107 S. W., 2d Series, 550.)

314

*James V. Allred,* former Attorney General, *William McCraw,* Attorney General, *Alfred M. Scott, Everett L. Looney, Bryan Blalock,* Assistants Attorney General, *Cofer & Cofer,* and *George Mendell,* all of Austin, for plaintiff in error.

An invalid exception having been introduced into the Texas anti-trust laws, by the codifiers of the 1911 and 1925 revisions of the statutes, the legislative intent in including such exceptions will not be construed in such a manner as to repeal the anti-trust law in its entirety and render it invalid and unconstitutional. Davis v. Wallace, 257 U. S. 478, 66 L. Ed. 325; Carr v. State, 127 Ind. 204, 22 Am. St. Rep. 624, 26 N. E. 778.

Where articles of the statute have been construed prior to their inclusion in the Penal Code so as not to render the laws unconstitutional, such construction became part of the statutes as re-enacted. Waters-Pierce Oil Co. v. State, 106 S. W. 918, affirmed in 212 U. S. 86, 53 L. Ed. 417; Cargill v. Kountze, 86 Texas 386, 22 S. W. 1015, 25 S. W. 13, 24 L. R. A. 183, 40 Am. St. Rep. 853; Heney v. Davidson, 119 Texas 451, 32 S. W. (2d) 452; 59 C. J. 1062.

*Andrews, Kelley, Kurth & Campbell,* of Houston, for Standard Oil Co.; *Williams, Neethe & Williams,* of Galveston, for Socony-Vacuum Oil Corp.; *Wm. H. Burgess,* of El Paso, and *Charles L. Black,* of Austin, for Standard Oil Co. of California; *E. E. Townes* and *Hines H. Baker,* both of Houston, and *Ben H. Powell* and *T. H. McGregor,* both of Austin, for Humble Oil &

Refining Co.; *H. T. Klein,* of New York City, *W. O. Crain* and *W. K. Hall,* both of Houston, and *Black & Graves,* of Austin, for the Texas Co.; *James J. Cosgrove,* of Ponca City, Oklahoma, and *Burney Braly,* of Fort Worth, for Continental Oil Co.; *John E. Green, Jr.,* of Houston, *P. O. Settle,* of Fort Worth, and *R. L. Batts,* of Austin, for Gulf Refining Co.; *R. T. Osborn,* of New York City, *C. R. Wharton,* of Houston, and *V. R. Tomlinson* and *Cantey, Hanger & McMahon,* all of Fort Worth, for Sinclair Refining Co.; *W. H. Francis, A. S. Hardwicke,* and *Walace Hawkins,* all of Dallas, and *Dan Moody,* of Austin, for Magnolia Petroleum Co.; *Thompson, Knight, Baker & Harris,* of Dallas, for Simms Oil Co.; *Phillips, Trammell, Estes, Edwards & Orn,* of Fort Worth, for Cities Service Oil Co.; *John Hancock,* of Fort Worth, for Texas Pacific Coal & Oil Co.; *Henry Brooks* and *Polk Shelton,* both of Austin, for Texas Petroleum Marketers Assn.; *Wm. H. Burgess,* of El Paso, for Pasotex Petroleum Co.; *Charles I. Francis,* of Wichita Falls, for American Petroleum Institute; *Thompson, Mitchell, Thompson & Young,* and *Calvin A. Brown,* all of St. Louis, Missouri, and *W. A. Keeling,* of Austin, for Shell Union Oil Corp. and Shell Petroleum Corp., all defendants in error.

The Code of Practices, for petroleum industries, was not an agreement in restraint of trade or competition nor did it tend to foster monopoly. American Steel Co. v. American Steel & Wire Co., 244 Fed. Rep. 300; Federal Trade Com. v. Beech-Nut Packing Co., 257 U. S. 441, 66 L. Ed. 307; Van Camp & Sons v. American Can Co., 278 U. S. 245, 73 L. Ed. 311.

The State is prohibited from passing any statute forbidding any persons, corporations or associations to make contracts agreeing to abstain from wrongful and unfair practices, and if the anti-trust laws of Texas be given the construction that such laws prohibit the adoption of a code of fair practices, which code is adopted for the purpose of freeing trade and commerce from unfair restraints, such laws are unconstitutional and void for the reason that they will deprive all persons engaged in every industry in the State of their right to execute ordinary contracts, and will deprive them of their property without due process of law. Chamber of Commerce of Minneapolis v. Federal Trade Com., 13 Fed. (2d) 673; Turnz Pork Stores v. Wallace, Secretary of Agriculture, 70 Fed. (2d) 688; International Brotherhood of Teamsters, etc., v. United States, 291 U. S. 293, 78 L. Ed. 804.

*John D. Reese,* of McKinney, *O. H. Woodrow,* of Sherman, and *C. K. Ballard,* of Dallas, filed briefs as amici curiae.

MR. CHIEF JUSTICE CURETON delivered the opinion of the Court.

The Court of Civil Appeals made a correct general statement of this case (82 S. W. (2d) 402). The transcript, although properly reduced by agreements of counsel, is perhaps the largest ever filed in this Court, being four printed octavo volumes, containing two thousand, two hundred and sixty pages.

The suit was brought by the State against the defendants in error for alleged violations of the anti-trust laws, and recovery sought of statutory penalties, forfeitures of charters, cancellations of permits, and an injunction restraining defendants in error from carrying out "agreements, conspiracies and combinations in restraint of trade in violation of the anti-trust and monopoly laws of the State." The trial court sustained a general demurrer to the State's petition, on the ground, it is said, that the National Industrial Recovery Act and the Petroleum Code, approved by the President on August 19, 1933, superseded the Texas anti-trust laws. However, subsequent to this time the National Industrial Recovery Act was held unconstitutional and void by the Supreme Court of the United States (Schechter Poultry Corp. v. United States, 295 U. S. 495, 79 L. Ed. 1570, 55 Sup. Ct. 837, 97 A. L. R. 947), so that the stated basis of the action of the trial court no longer exists. The Court of Civil Appeals, however, affirmed the decree of the district court, on the conclusion that the anti-trust laws of Texas were unconstitutional and void because discriminatory and in violation of the Fourteenth Amendment to the Constitution of the United States. This conclusion was predicated directly upon the provisions of Article 1642 of the Revised *Penal Code* of Texas of 1925, purporting to exempt agricultural products and live stock from the operations of the anti-trust laws, so long as in the hands of the producer. The State's application for writ of error was granted.

We quite agree with the Court of Civil Appeals that if the Texas anti-trust statutes are valid, the State's petition was not subject to general demurrer. The petition (comprising 294 printed pages) is entirely too long for us to state its details in this opinion. It appears to be primarily predicated upon the alleged action of the defendants in error in originating and becoming parties to a certain "Code of Practices for the Marketing of Refined Petroleum Products," as a basis for carrying out restrictions in trade, and as an instrumentality for violating the anti-trust laws of the State. The history of the origin and execution of this code is fully stated, and finally it is said that the code was approved by the Federal Trade Commission, a governmental agency created by Congress. This code consists of 21 rules,

with interpretations thereof, relating primarily to the sale of petroleum products through filling stations in *intrastate* commerce in Texas. The Court of Civil Appeals was of the opinion that while some of the rules might furnish a basis for the State's charges, some were not unlawful. We express no opinion as to the correctness of the last conclusion. All that we are now to consider is whether or not the State's petition as a whole states a cause of action.

In our opinion, the rules, when considered as a whole, in the light of the State's allegations, do furnish a basis for an actionable charge against the defendants in error. Indeed, some of the rules on their faces are strongly suggestive of a violation of the anti-trust statutes. This is plainly true of Rule 1, of Group 1, in which the defendants in error undertake to restrict or prohibit the installation and loaning of filling station equipment free of charge, and agree among themselves as to what charges should be made for certain units of installation. R. C. S., 1925, Art. 7426, subdivisions 1, 2, 3, 4, and 5. Rule 1, as well as the other rules referred to herein, will be copied in the margin at the close of this opinion.[1] Rule 7, of Group 2, is equally suggestive as being a restriction of trade in violation of the anti-trust laws of the State. Briefly, the effect of the rule was to prohibit the use of the lease and license plan by which a refining company or wholesaler would lease filling stations, and sublet them to its retailer for a smaller rental, etc. It is a fair deduction that the purpose of this rule was to create a common practice among the oil companies so as to avoid competition. Rules 8 and 9 are certainly restrictive and quite suggestive of a violation of the anti-trust laws of the State. They prohibit the donation of petroleum products in the aviation industry, and the donation of money or other things of value in connection with the purchase of such products. Rules 10, 11, 12, and 13 are also suggestive of a violation of the anti-trust laws. Rule 10 prohibits refiners, wholesalers, etc., from assisting retailers in the construction of their stations, or the loaning of money for such purpose, or the loaning of operating equipment. Rule 11 also prohibits the loaning of certain classes of equipment to distributors, etc. Rule 12 prohibits refiners, distributors, etc., from paying rentals or allowances to retailers for installations and display advertising. Rule 13 prohibits refiners, distributors, etc., from renting from dealers or consumers any delivery equipment, and from purchasing any such equipment for more than its actual value. Rules 14 and 16 are also suggestive of a violation of the anti-

---

[1]*Post,* page 335.

trust laws. Rule 14 provides that refining companies, wholesalers, etc., may own service stations, and may lease such stations to dealers who distribute their products, but restricts the right to lease for less than a fair return on the value of the property for filling station purposes. Rule 16 prohibits the donation of oil or other thing of value, or the granting of special inducements on opening of filling stations, or special sale days or other occasions. Rule 17 requires refiners, distributors, jobbers, and wholesalers to post their prices conspicuously, and not deviate therefrom. The State alleges that the purpose and resultant effect of this rule, as followed by defendants in error, was to destroy any competition in the sale of petroleum products, and we can not say on demurrer that such may not have been its purpose and effect. Rules 19 and 20, prohibiting discounts from posted prices by the use of coupon books, or by allowances and credits upon change in the prices posted, have the same object as Rule 17, and were capable of being used for the same purposes as that rule.

Without passing on omitted rules, we have named the above rules and copied them in the margin for the purpose of showing that this code furnishes some basis for the State's allegations that the defendants in error entered into a conspiracy to, and did, violate the anti-trust laws. Corroborative of the State's allegation that the execution of this code was for the purpose of creating an instrumentality by which the anti-trust laws of Texas could be violated, and consistent with our conclusion that certain rules thereof are suggestive of such purpose, is a purported document copied in the thirty-sixth paragraph of the State's petition. It is there alleged that at a certain meeting, at which the defendants in error were represented, a certain resolution was passed with reference to the adoption of the code before us, which in part reads:

" '(d) That on account of the Texas Anti-Trust laws, the refiners or marketers of refined petroleum products in Texas refrain from entering into any agreement, or agreements, or any understandings with reference to the Code of Practices so far as applies to business done in the State of Texas, and that in accepting and adopting the Code such refiner or marketer should not use the form of stipulation suggested by the Federal Trade Commission, which evidences an agreement, but should use in lieu thereof some form that states such acceptance or adoption as a matter of individual action.' "

In addition to the allegations that the defendants in error adopted and adhered to the code, the State pleads that by reason

of its execution and their adherence thereto the defendants in error were enabled to largely monopolize the retail oil industry of the State.

In paragraph 66 of the State's petition it is alleged:

"That the defendants and each and all of them, have entered into the agreements, conspiracies and combinations in restraint of trade, as hereinbefore set out, and that each and all of them proceeded to take over, secure and acquire practically all of the independent filling stations and market outlets in this State, and to enter into and secure with said independent filling stations, 100 per cent dealer's lease and agency agreements, under which said independent stations thereafter agreed to handle only the products of the said defendants securing said lease. That these independent filling stations were approximately *eighteen thousand in number*, and were doing business over the entire State of Texas." (Italics ours.)

In paragraph 67 of the State's petition the allegation is made:

"That by virtue of the 'Code of Ethics' and Rule 17 thereof in particular, and other rules, and through the acquiring of practically all independent gasoline retail stations in the State of Texas, the defendants were able and have been able, since placing the Code into effect, to dictate and maintain a common standard and scale of prices at each marketing point in the State of Texas where said defendants operate service stations and which heretofore were operating at said points upon a competitive basis. That since the 20th day of November, 1929, from time to time, changes have been made and posted in the price of petroleum products to the consumer. At each time when said change was made by any one of the defendants all of the other defendants immediately, or within two or three days of such change, met and posted said change in price so that all of said defendants at each particular marketing point charged and maintained the same standard price for the same character of goods."

On the whole, we believe that the State has made sufficient allegations, relevant one to another, to state a cause of action which is good on general demurrer. The Federal Trade Commission had no authority or power to undertake to regulate *intrastate* business in petroleum and its products in Texas, and its attempt (if it made any such attempt, which is not clear to us) was ineffective to suspend, modify, void, or destroy the "Anti-Trust Statutes of Texas."

The primary question involved in this case is whether or not the civil anti-trust laws of the State are discriminatory and

therefore violate the Fourteenth Amendment to the Constitution of the United States. The insistence of defendants in error is predicated upon Article 1642 of the *Penal Code,* which it is said exempts farmers and stock raisers from the provisions of the anti-trust laws, and upon a somewhat analogous provision found in the Co-operative Marketing Act.

■  We have concluded that the Court of Civil Appeals was in error in holding the anti-trust laws void; and we are also of the opinion that the insistence that the existence of the Co-operative Marketing Act renders the anti-trust laws invalid is without merit. Our reasons for these conclusions will now be stated.

Our first anti-trust act, passed in 1889, the second in 1895, and the Penal Code of 1895 each contained a section which read:
"No provision of this law shall apply to agricultural products or live stock while in the hands of the producer and raiser."

In the case of Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 46 L. Ed. 679, 22 Sup. Ct. 431, a similar statute, a part of the anti-trust act itself, was held to render void the entire act.

Following this opinion, the Supreme Court of Texas in the case of State v. Shippers' Compress & Warehouse Co., 95 Texas 603, 611, 69 S. W. 58, held that the Texas anti-trust law was void because of the incorporation within its provisions of the exemption clause above quoted. Previous to this time, however, the Legislature had passed the anti-trust act of 1899, which the courts of this State held was not void since it did *not* contain the invalid provision of previous laws and the Civil Statutes and Code of 1895, which conclusion was concurred in by the Supreme Court of the United States. State v. Laredo Ice Co., 96 Texas 461, 466, 73 S. W. 951; National Cotton Oil Co. v. Texas, 197 U. S. 115, 132, 133, 49 L. Ed. 689, 25 Sup. Ct. 379. Again, the Legislature by an act approved March 31, 1903, enacted a new anit-trust law, which likewise did *not* contain the exemption provision previously condemned. Section 18 of this Act, the emergency clause, recites one reason for the emergency was that the act of 1895 had been held unconstitutional in the Connolly decision by the United States Supreme Court on March 10, 1902.

The statutes were codified in 1911. The Anti-Trust Act of 1903 was incorporated in the Revised Civil Statutes, and like the legislative act did *not* embrace the exemption or immunity provision previously condemned by the courts. However, the objectionable exemption clause was incorporated in and became Article 1477 of the Penal Code of 1911. Subsequently, in 1925, when the statutes were again revised, the Revised Civil Statutes again omitted the previously declared void provision, while the

Penal Code, evidently copied from that of 1911, again embraced the condemned immunity clause (Penal Code, 1925, Art. 1642). The insistence here is that because the Penal Code contains this allegedly void provision, the Revised Civil Statutes, in so far as they relate to trusts, etc., violate the Fourteenth Amendment to the Constitution of the Unied States, and are void. We think the insistence without merit. It is true that the Revised Civil Statutes and the Penal Code, in so far as each relates to the subject of suppressing monopolies, trusts, etc., comprehend the same general subject; but they are not the same law. The Revised Civil Statutes were enacted by the Legislature by a bill entirely separate from that by which the Penal Code and the Code of Criminal Procedure were enacted, and at a subsequent time.

It is obvious from the captions, enacting clauses, introductory sections, etc., that the Legislature intended that the Revised Civil Statutes and the Codes should be separate laws, and that had one of them failed in its passage through the Legislature, or had one of them been vetoed by the Governor, the other nevertheless would have been an effective and valid enactment. The enactment and validity of one was in no manner dependent upon the enactment and validity of the other.

The Revised Civil Statutes govern the civil relations of the citizens of the State, one to another and to the State, with sanctions found only in civil remedies; while the Penal Code, though for the purpose of protecting the citizens in their rights and liberties, finds its sanctions in punishments by fines, imprisonment, and execution through criminal prosecutions in the name of the State for criminal conduct "Against the Peace and Dignity of the State." (Code of Criminal Procedure, Arts. 396, 414.)

Thus the manner of enactment and the purposes of the Revised Civil Statutes and of the Penal Code show clearly that they were intended to be, and are, two separate distinct laws. Moreover, they have always been so treated during the entire legislative and judicial history of the subject since the adoption of the Constitution in 1876. The Civil and Penal Codes have been enacted by separate bills each time the statutes have been codified, as shown by the codifications of 1879, 1895, 1911, and 1925. It is also true that since the adoption of the Constitution of 1876 we have had two supreme tribunals that interpret these Codes, viz., the Supreme Court, the decrees of which are final in all cases under the Civil Statutes, and the Court of Criminal Appeals, the court of last resort in all cases under the Penal Code. We conclude that the Revised Civil Statutes and the Penal Code are separate and distinct enactments, the validity of one

in no way dependent upon the validity of the other; and that the exemption or immunity provision (Penal Code, Art. 1642) in no way affects the validity of the statutes here involved.

There is nothing in the Co-operative Warehouse and Marketing Act (Vernon's Texas Statutes, 1936, Arts. 5737 to 5764) which would warrant us in saying that the creation of each such corporation thereunder, and its operation, would necessarily be in violation of the anti-trust laws of the State. There is a provision, however, which furnishes a basis for the insistence that corporations of this character are exempted from the anti-trust laws of the State. Article 5762 of the Revised Civil Statutes, 1925, reads:

"Art. 5762. No association organized hereunder shall be deemed to be a combination in restraint of trade or an illegal monopoly; or an attempt to lessen competition or fix prices arbitrarily; nor shall the marketing contracts or agreements between the association and its members nor any agreements authorized in this chapter, be considered illegal or in restraint of trade."

My associates and I are agreed that the enactment of the Co-operative Marketing Act did not, and does not, invalidate our anti-trust laws. This common conclusion has been reached for different reasons, which will be separately stated. My associates have prepared a statement of their views, which is as follows:

"Some of the defendants in error take the position that the Co-operative Marketing Act, Chapter 8, Title 93, Arts. 5737-5764, Revised Civil Statutes, has operated to repeal, or in some way invalidate our anti-trust laws, Title 126, Art. 7426 et seq., of the Revised Civil Statutes, and Chapter 3, Title 19, of the Penal Code of Texas, 1925. We have held that the two codes were enacted in separate Acts, and will consider here only the Civil Statutes.

"The tendency of recent State and Federal laws is towards a more liberal relaxation of agricultural associations, created under the Co-operative Marketing Act, from the rigors of anti-trust laws. Articles 5737-5764, Revised Civil Statutes of Texas; 9 Texas Jurisprudence, pp. 558-564; the Clayton Act, October 15, 1914, Ch. 323, 38 Stat. 730; U. S. C. A., Tit. 15, Sec. 17; the Capper-Volstead Act, February 18, 1922, Ch. 57, 42 Stat. 388; U. S. C. A., Tit. 7, Secs. 291-292; the Co-operative Marketing Act, July 2, 1926, Ch. 725, 44 Stat. 802; U. S. C. A., Tit. 7, Secs. 451-457, and Tit. 12, Sec. 1141; 41 Corpus Juris, p. 167;

6 Ruling Case Law, p. 411; Thompson on Corporations, (3d ed.) Vol. 8, Sec. 6770 et seq.

"Article 5762, Revised Civil Statutes, reads as follows:

" 'No association organized hereunder shall be deemed to be a combination in restraint of trade or an illegal monopoly; or an attempt to lessen competition or fix prices arbitrarily; nor shall the marketing contracts or agreements between the association and its members nor any agreements authorized in this chapter, be considered illegal or in restraint of trade.'

■ "This Court, as well as the courts of many other jurisdictions, has liberally construed the Co-operative Marketing Acts, in order to accomplish the objects for which they were enacted. See Texas Farm Bureau Cotton Assn. v. Stovall, 113 Texas 273, 253 S. W. 1101; Lennox v. Texas Cotton Co-op. Assn., (Texas Com. App.) 55 S. W. (2d) 543; Texas Certified C. Breeders' Assn. v. Aldridge, 122 Texas 464, 61 S. W. (2d) 79; Hollingsworth v. Texas Hay Assn., 246 S. W. 1068 (writ refused) ; Liberty Warehouse Co. v. Burley Tobacco Growers' Co-op., etc., Assn., 276 U. S. 71, 48 Sup. Ct. 291, 72 L. Ed. 473, and the cases cited and referred to in the footnotes; 41 C. J., p. 167, and cases cited.

"In the 1921 Co-operative Marketing Act the Legislature declared it to be the public policy of this State that an association organized thereunder shall not be deemed 'a combination in restraint of trade or an illegal monopoly; * * *.' This policy has not been repealed in the amendments to the Act. And, it has been held by the courts of this State that the Act of 1921 did not violate the anti-trust statutes. Lennox v. Texas Cotton Co-op. Assn., supra; Hollingsworth v. Texas Hay Assn., supra, writ refused.

■ "The Co-operative Marketing Act is comprehensive in its terms. It authorizes the creation of associations to carry out certain purposes. We hold that a corporation created under this Act may do the legitimate things for which it is created. We do not assume that they will make contracts or adopt methods of carrying on their business in clear violation of the anti-trust laws.

■■ "With the public policy specifically announced by the Legislature of this State relating to associations created under the Co-operative Marketing Act, as reflected in the many laws passed on this subject, we are not prepared to hold that an association created under our Co-operative Marketing Act violates our anti-trust, monopoly, or conspiracy statutes, and that it should be declared illegal. The Legislature has the right, within the exer-

cise of its power, to make certain classifications of subjects and persons; but such classifications must not be arbitrary or unreasonable. The 1921 and 1930 Acts contain the provision that if any part of the Act should be declared invalid, the remainder of said Act would not be affected. The Act was amended again in 1930, H. B. No. 54, Chap. 20, p. 145, of the 5th Called Session of the 41st Legislature. Again, in 1934, the Act was amended, H. B. No. 116, Chap. 31, p. 81, of the 2d Called Session of the 43d Legislature. In the event any part of the Act should be invalid, it would be separable from the valid parts. If it should be held, however, that the Co-operative Marketing Act was intended to give the corporations to be formed thereunder the power and authority to do any of the things denounced by our anti-trust laws, and should it further be held that the giving of such power and authority created an unreasonable and unconstitutional classification in favor of such corporations, such holdings would render the Co-operative Marketing Act, at least to that extent, unconstitutional; and if it should be held that the Co-operative Marketing Act, or any of its provisions, is unconstitutional, such holding would not in any way affect the anti-trust laws. Our anti-trust laws were placed upon the statutes long before the Co-operative Marketing Act was enacted, and the anti-trust statutes have repeatedly been held valid. Waters Pierce Oil Co. v. Texas, 48 Texas Civ. App. 162, 106 S. W. 918 (writ refused)·; Id., 212 U. S. 86, 29 Sup. Ct. 220, 53 L. Ed. 417; Waters Pierce Oil Co. v. State, 19 Texas Civ. App. 1, 44 S. W. 936; Id., 177 U. S. 28, 44 L. Ed. 657, 20 Sup. Ct. 518. The rule has long been established that when an act has been held unconstitutional, such holding does not in any way repeal or affect a valid act. Waters Pierce Oil Co. v. State, 19 Texas Civ. App. 1, 44 S. W. 936; Id., 177 U. S. 28, 44 L. Ed. 657, 20 Sup. Ct. 518; Frost v. Co-op. Commission, 278 U. S. 515, 73 L. Ed. 483, 49 Sup. Ct. 235. Likewise, it has been held that where an amendment to an act has been declared invalid, the original act remains in full force and effect. See also Texas-Louisiana Power Co. et al. v. City of Farmersville, (Com. App.) 67 S. W. (2d) 235; Culberson v. Ashford, 118 Texas 491, 18 S. W. (2d) 585; James C. Davis, Director-General, v. George Wallace, 257 U. S. 478, 42 Sup. Ct. 164, 66 L. Ed. 325."

Personally, I think that the purpose of the article (5762) quoted above is to exempt co-operative marketing associations (corporations) from the operation of the anti-trust laws of the State. This being the purpose of this article (which was Section 26 of Chapter 22, Acts of 1921), it is null and void, because in violation of Section 3, Article 1 of the Constitution of the State,

which declares that "all free men, when they form a social compact, have equal rights," etc.

In my opinion, the article quoted (5762) violates this provision of the Constitution because it is discriminatory and denies equal rights to those who are engaged in the occupations to which it relates; or, rather, if valid, it would give the Co-operative Marketing Act that effect. Under the terms of the exemption only corporations chartered under the act, and their contracts, are granted immunity from the provisions of the anti-trust laws.

If it should be said that those engaged in agriculture may be constitutionally named as an exempt class, and their contracts and agreements be exempted from the anti-trust statutes, still the *above article does not exempt them*. If this article, as I interpret it, should be held valid, we should be in the attitude of saying that while these corporations could do those things prohibited by the anti-trust statutes, yet unincorporated associations formed for the same purpose, or partnerships, or individuals, having the same objects and purposes, and operating in the same way, would be subjected to the pains and penalties of the anti-trust statutes. This is precisely what was held in the case of Fisher v. El Paso Egg Producers' Assn., 278 S. W. 262, a case which did not reach the Supreme Court. Such a construction—one granting immunity to corporations composed of farmers, but at the same time denying immunity to farmers individually and to unincorporated associations of farmers for similar purposes—is of course condemned by our Constitutions, both State and Federal. 9 Tex. Jur., p. 551, Sec. 115, p. 553, Sec. 117, p. 554, Sec. 118; Davis v. Holland, 168 S. W. 11 (writ refused) ; Campbell, Receiver, v. Cook, 86 Texas 630, 634, 26 S. W. 486; Cathey v. Weaver, 111 Texas 515, 528, 242 S. W. 447; Truax v. Corrigan, 257 U. S. 312, 66 L. Ed. 254, 42 Sup. Ct. 124, 27 A. L. R. 375; Frost v. Corporation Commission, 278 U. S. 515, 522, 49 Sup. Ct. 235, 73 L. Ed. 483. As said by Mr. Justice SUTHERLAND in the case of Frost v. Corporation Commission, 278 U. S. 515, 522:

"The purpose of the clause in respect of equal protection of the laws is to rest the rights of all persons upon the same rule under similar circumstances. Louisville Gas Co. v. Coleman, 277 U. S. 32, 37. This Court has several times decided that a corporation is as much entitled to the equal protection of the laws as an individual. Quaker City Cab Co. v. Penna., 277 U. S. 389, 400; Kentucky Corpn. v. Paramount Exchange, 262 U. S. 544, 550; Gulf, Colorado & Santa Fe Ry. Co. v. Ellis, 165 U. S. 150, 154. *The converse, of course, is equally true. A classification*

*which is bad because it arbitrarily favors the individual as against the corporation certainly can not be good when it favors the corporation as against the individual. In either case, the classification, in order to be valid, 'must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'"* (Text italics ours.)

What I have just said in no manner conflicts with what was said by Mr. Justice McREYNOLDS in upholding the Kentucky Warehouse and Marketing Act, 276 U. S. 71, 90, 48 Sup. Ct. 291, 72 L. Ed. 473, *for the reason that Kentucky had no anti-trust act which applied to individuals and did not apply to corporations of the character involved;* in other words, there was no discriminatory law, and, therefore, no discrimination.

In so far as has been called to my attention, the constitutional question here involved has never before been raised or presented to this Court, and, of course, has never been passed on. The only constitutional question ever presented to the Supreme Court was that involved in Hollingsworth v. Texas Hay Association, 246 S. W. 1068, where it was contended in the application for writ of error (which we refused) that the Warehouse and Marketing Act, and the contract in issue, violated Section 26, Article 1, of the Constitution, which declares that monopolies shall never be allowed.

The Court was unable to say that the act, considered as a whole, was intended to sanction monopolies or necessarily lead to that result, nor did it think that the contract there involved, under the record before it, violated the organic act. Our conclusion is now well supported by authorities from other jurisdictions. Tobacco Growers' Co-op. Assn. v. Jones, 185 N. C. 265, 117 S. E. 174, 33 A. L. R. 231, and authorities cited in the text and annotations; see also annotations, 77 A. L. R. 406, 25 A. L. R. 1113, 47 A. L. R. 936. No other constitutional question was raised or decided.

Holding Article 5762 void, however, does no violence to the remainder of the act. Section 27 of the original act (Chapter 22 of the Acts of 1921) contained this provision:

"Section 27. If any section of this act shall be declared unconstitutional for any reason, the remainder of the act shall not be affected thereby."

In 1930, when the act was largely rewritten by amendment, a similar provision was placed in the law. (Acts, 4th C. S., 41st Leg., Chap. 12.) These provisions clearly show the Legislature

would have enacted the measure notwithstanding the invalidity of the immunity section heretofore quoted.

I am of the opinion that corporations created under the Warehouse and Marketing Act are subject to the provisions of the anti-trust laws the same as all other persons, individual or corporate. It is obvious, then, that under both the majority and minority views the enactment of the Warehouse and Marketing Act had no effect on the validity of the anti-trust laws of the State. From what has been heretofore said, it is clear, we think, that the Court of Civil Appeals erred in holding the anti-trust laws of the State invalid.

The defendants in error filed cross assignments involving pleas *in limine*, which will now be considered. The first cross assignment is predicated upon Revised Civil Statutes, Article 7433.

■ The insistence is that this statute prohibits the filing of a suit to enjoin a foreign corporation from transacting business until in a previously filed and different suit it has been found guilty of violating the anti-trust laws of the State. The language employed in the first sentence of the statute, "when any foreign corporation is adjudged guilty," etc., suit may be filed, lends color to this insistence, but we have concluded it is without merit. Article 7433 was a part of Chapter 5, Acts of 1923 (Session Laws, p. 12), the purpose of which was to amend Articles 7800, 7801, and 7803 of the Revised Civil Statutes of 1911. These Articles, as they then existed, made the forfeiture of charters of domestic corporations and permits of foreign corporations *mandatory* when adjudged guilty of violations of the anti-trust laws. The sole purpose of the Act of 1923 (of which Article 7433 of the present Revised Civil Statutes was a part) was to eliminate the requirements of mandatory forfeiture as to both domestic and foreign corporations. This is clear from the emergency clause of the Act of 1923: "The fact that there is no law which gives to the Attorney General *any discretion or to the courts any option in forfeiting the charter of a domestic corporation or denying the right of a foreign corporation to do business in this State, that has been adjudged guilty of violating the anti-trust laws, creates an * * * emergency,*" etc. (Italics ours.) Language more apt to express the one purpose stated in the emergency clause could have been employed in Article 7433. (Art. 7803, R. C. S., 1911, as amended by Chap. 5, Acts of 1923.) However, if we strike from the first line of this article the one word *"adjudged,"* the meaning becomes clear and wholly consistent with the purpose of the act as declared in the emergency clause. It is quite an elementary rule that once you have ascer-

tained the *purpose* of a legislative act, the meaning of the words used may be restricted or enlarged, or may be disregarded, in order to give it the meaning which effectuates its manifest purpose. 39 Tex. Jur., p. 179, Sec. 95, p. 183, Sec. 96, p. 184, Sec. 97. We think it plain, also, that the Legislature by the use of this *one word "adjudged"* did not intend to change the public policy of the State, that all relevant causes of action growing out of the same transaction should be determined in one lawsuit. Nor do we believe that the Legislature intended to place in the statute a confusing provision, entirely foreign to the declared purpose of the act, and at variance with the Revised Civil Statutes, Articles 1349 and 1351, provisions of the general corporation statutes under which the complaining foreign corporations received their permits, which authorize forfeitures of corporate charters and permits for violations of the law, without requiring two suits as to either foreign or domestic corporations. (Revised Civil Statutes, Title 32, Chapters 3 and 19.) Was it intended by Article 7433 to limit this right by requiring two suits instead of one, when the offense charged was the grave one of violating the anti-trust laws of the State? We think not. We are to interpret the language used in a manner to make all relevant laws harmonious, if we can, and in a manner consistent with the public policy of the State, as well as in the light of the evils sought to be remedied by the legislation before us. 39 Tex. Jur., p. 214, Sec. 115, p. 216, Sec. 116, p. 232, Sec. 124. We overrule the first cross assignment of error.

The second cross assignment to the effect that the State's petition shows a misjoinder of parties and causes of action is without merit.

■ The State's petition charges a *conspiracy,* not in the limited statutory sense of Article 7428, but in the usual legal meaning of the term, in the sense essential to alleging the basis of a cause of action under Article 7426,—that is, it charges that the defendants in error formed a combination and agreement to violate the anti-trust and anti-monopoly laws of the State. An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. Under the conspiracy charges of the petition, if proven, each of defendants in error is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination. 9 Tex. Jur., p. 396, Sec. 17; 12 C. J., p. 610, Sec. 178; Raleigh & Heidenheimer Bros. v. Cook, 60 Texas 438, 441; State v. Racine Sattley Co., 63 Texas Civ. App. 663, 134 S. W. 400, 404, and cases cited.

330

Since the cause of action asserted against each of the defendants in error arose out of their joint action, it is plain that the State's cause against each may be asserted in one suit against all the participants. 32 Tex. Jur., p. 38, Sec. 23, p. 47, Sec. 28; 12 C. J., p. 613, Sec. 187, and cases in Note 64; 1 C. J., p. 1082, Sec. 239, and cases in Note 86; 1 C. J. Secundum, p. 1246, Sec. 92, p. 1273, Sec. 96; State v. Lorillard Co., 181 Wis. 347, 193 N. W. 613; State v. Standard Oil Co., 218 Mo. 1, 362, 116 S. W. 902, 1013; Copeland-Chatterson Co. v. Business System, 11 Ontario L. R. 292; O'Keeffe v. Walsh, 2 Irish Rep. (1903), p. 681. Not only does the State's cause of action arise out of a joint·transaction, but common relief· to the extent of the injunction prayed for is asked against all the defendants.

■ In view of the general object of the anti-trust laws to effectually suppress monopolies, it is plain to us that the purpose of the State in this action is to suppress the wrong of the defendants in error in entering into a combination to violate and in violating the anti-trust laws of the State, and that this basic purpose is the State's primary cause of action; although as incidental to it, and in aid of its effectuation, the State has the authority, under the statute, to recover penalties from the defendants in error, should they be adjudged guilty.

As said in the case of State v. Lorillard, cited above, a case precisely in point on the subject of misjoinder:

*"The delict of the defendants is the conspiracy alleged and their acts in its execution. The primary right and duty of the State and the wrong of the defendants constitute the cause of action, and we regard it as one cause of action, although, as incidental to it, there may be different forms of relief as against the different defendants.*

*"Hence it is our conclusion that there is no misjoinder of causes of action."* (Italics ours.)

In the instant case there was neither misjoinder of parties nor of causes. The second cross assignment is overruled.

What we have heretofore said disposes of the third cross assignment, and it is also overruled.

■ The fourth cross assignment, relating to the late entry of the Sinclair Refining Company into the State, is without merit, and is overruled. This company is sued as a coconspirator with the other defendants in error, and having once entered the conspiracy, however late, becomes in law a party to every act previously or subsequently done by any of the others in pursuance of it. 12 C. J., p. 612, Sec. 181.

■ Writs of attachment, at the instance of the State, were issued against the Standard Oil Company of New Jersey, the Socony Vacuum Company, and the Standard Oil Company of California, and levied on stock severally owned by said companies in the order named, respectively, in the Humble Oil and Refining Company, the Magnolia Petroleum Company (both Texas corporations), and the Pasotex Petroleum Company, a foreign corporation doing business in Texas under a permit. The several writs were levied by leaving notices at the offices or with the proper officers of the last named companies, as provided by law. R. C. S., Arts. 1289, 3795. Writs of garnishment were also severally sued out against the last named three companies requiring them to answer and disclose the number of shares of stock respectively owned by the first named three companies in them.

We are of the opinion that in each instance the issuance of the writs and their execution was without statutory authority, and therefore without due process of law. The three corporations named above were foreign corporations, so designated in the State's petition, and were served by process as such in this suit. The sole ground for the issuance of the writs of garnishment was the fact that attachments had previously issued. Statutory authority to issue writs of attachment and garnishment in anti-trust cases is to be found in Revised Civil Statutes, Article 1376.

Revised Civil Statutes, Articles 1372 to 1378, including the article just referred to, were enacted as one law in 1907 (Acts 1907, p. 175), and as passed plainly confined its application to domestic corporations and to foreign corporations *authorized* to do business in this State; and it was placed in the Revised Civil Statutes of 1911, as found in the Session Acts. (R. C. S. 1911, Arts. 1193 to 1196.)

This act was a very elaborate and carefully drawn measure, directed no doubt to conditions which then concerned the State, and was for the purpose of curing what was deemed by the Legislature as grave defects in the then existing laws. Its effect was to create liens against the properties of corporations chartered by the State and foreign corporations having permits to transact business in the State violating the anti-trust laws, and to provide methods of seizing their property and holding it subject to the payment of the penalties and fines provided by the anti-trust laws. It authorized the issuance of the processes named, including attachment and garnishment *"without bond."*

In the recodification of 1925 certain omissions from the original language employed were made; but we do not believe that these omissions made any change in the meaning and pur-

pose of the original enactment. As originally passed, and as it appears in the first section of the Act of 1907, Article 1372 by express language was intended to affect corporations created under the laws of the State *"or any foreign corporation authorized to do business in this State."* When this act (Art. 1193, R. C. S., 1911) was recodified in 1925, the initial language was changed to read: "Whenever any domestic or *foreign corporation in this State* shall violate any law of this State, * * *." The State in the instant case insists that this omission or change of language had the effect of enlarging the scope and purpose of the original law and made it applicable to foreign corporations, regardless of the fact that they might not have permits to transact business in the State of Texas. This position is untenable.

Referring to the original enactment of the statutes before us (R. C. S., Arts. 1372 to 1378) in 1907, and to the codification of 1911, it is indisputable that in all respects the liens there provided and the remedies of attachment, garnishment, sequestration, etc., were made applicable only to corporations chartered by the State and to *foreign corporations operating in the State by virtue of statutory permits to do so.* Under the existing statutes, as codified in 1925, it is plain that Article 1373 creating liens, Article 1375 relating to receiverships, and Article 1377 relating to foreclosures of the created liens, etc., apply only to domestic corporations and to *foreign corporations operating in the State under permits.* The only controversial point is whether or not the change of the language employed in Article 1372 from that of the original enactment, as noted above, warrants a change in meaning and purpose different from that clearly stated in the original act and in the codification of 1911. It is altogether plain that it does not do so.

Interpreting Article 1372 in connection with the other articles named, which are so related to it in context as necessarily to be a part of it, which we must do, and in the light of the original enactment and the codification of 1911, to which we have a right to refer in cases of ambiguity, the conclusion is inescapable that Article 1372 refers to and governs only domestic corporations chartered by the laws of this State and *foreign corporations operating in this State by virtue of permits issued under the statute.* 39 Tex. Jur., pp. 260, 264, Secs. 138, 139; p. 209, Secs. 112, 113; p. 214, Secs. 115, 116.

Revised Civil Statutes, Article 281, permitting the issuance of attachments in suits "founded in tort or upon unliquidated demands," obviously has no application in this case. The attachments here issued were issued in a suit by the State for *penalties*

in an anti-trust action under statutes specially providing therefor, enacted six years before Revised Civil Statutes, Article 281, became a law. They constitute a special provision for a designated type of suit and must be held to create an exception or proviso to the general statute exclusive in character. 39 Tex. Jur., p. 212, Sec. 114.

It is plain that since none of the three foreign corporations here (served by process only as such) immediately under consideration, namely, the Standard Oil Company of New Jersey, the Socony Vacuum Company, and the Standard Oil Company of California, had permits to transact business in this State, and were not chartered by the State, that Article 1376 has no application and the attachments and garnishments issued were void, and should have been quashed and dissolved.

■ We think that when the three foreign corporations named above appeared and answered (although under protest) their appearances under our statutes were general appearances, and that they were then, and are now, before the court subject to personal judgments, the same as the defendants which had been cited in the usual way. The ruling of the trial court in this respect was correct. 4 Tex. Jur., p. 616, Sec. 3, p. 626, Sec. 11, p. 630, Sec. 13, p. 645, Sec 23, p. 651, Sec. 27, and authorities cited in the notes; 4 C. J., pp. 1369, 1370, Sec. 67; Sam v. Hochstadler Bros., 76 Texas 162, 13 S. W. 535; Grizzard v. Brown, 2 Texas Civ. App. 584, 22 S. W. 252; Landa v. The Mercantile Banking Co., 10 Texas Civ. App. 582, 31 S. W. 55; Simon v. Temple Lumber Co., 146 S. W. 592; Osvald v. Williams, 187 S. W. 1001; see, also, York v. State, 73 Texas 651, 11 S. W. 869; Banco Minero v. Ross, 106 Texas 522, 172 S. W. 711; Western Cottage Piano Co. v. Anderson, 97 Texas 432, 79 S. W. 516; Pace v. Potter, 85 Texas 473, 22 S. W. 300; Ætna Life Ins. Co. v. Hanna, 81 Texas 487, 17 S. W. 35; see also the many cases cited in the notes to 4 C. J., p. 1369; York v. Texas, 137 U. S. 15, 11 Sup. Ct. 9, 34 L. Ed. 604; Kaufman v. Wootters, 138 U. S. 285, 11 Sup. Ct. 298, 34 L. Ed. 962.

While the Federal courts do not follow the Texas rule in cases originating in the Federal courts, they recognize it as being applicable to cases in the Texas courts. Mexican Cent. Ry. Co. v. Pinkney, 149 U. S. 194, 13 Sup. Ct. 859, 37 L. Ed. 699; Galveston, H. & S. A. Ry. Co. v. Gonzales, 151 U. S. 496, 14 Sup. Ct. 401, 38 L. Ed. 248.

In the case of Hochstadler Bros. v. Sam, 73 Texas 315, 11 S. W. 408, and Sam v. Hochstadler Bros., 76 Texas 162, 13 S. W. 535, the facts were similar to those of the instant case. Hochstadler Bros. were nonresidents, and were served as such. Sam

sued out an attachment, which was void, as in this case, because not within the statutory class. The Hochstadlers appeared and pleaded to the jurisdiction of the court, and then, subject to that plea, to the merits of the case, as in the case before us. The verdict and judgment for Sam was reversed on appeal by this Court because the attachment was void. The opinion of the Supreme Court was written by Associate Justice HENRY, in which he reversed and remanded the case, saying:

"It was only through the attached property that the court could have exercised jurisdiction over the defendants in this case, and then only to the extent of appropriating the attached property. The attachment failing, the jurisdiction of the court under the authority of Pennoyer v. Neff, 95 U. S. 714, does not exist, and the judgment must be reversed and the cause remanded." (73 Texas 315.)

The case then went back, and upon retrial was dismissed by the court. Upon the second appeal this Court held, as stated in the head notes,

"Service of citation was made in New York upon a resident of that city. An attachment was sued out and levied. The defendant appeared and moved to set aside the attachment, which motion was successful. *Held,* that such appearance put defendant in court for all purposes, at least at the succeeding term of the court." (76 Texas 162.)

In support of this holding the Court cited and applied the rule announced in York v. State, 73 Texas 652, 11 S. W. 869. This decision has never been overruled or modified by the Texas courts, but, on the contrary, has been followed, not only in applying the doctrine of the York case when cases did not embrace a seizure of property by court process, but in cases where such seizures were made. Grizzard v. Brown, 2 Texas Civ. App. 584, 22 S. W. 252; Landa v. Mercantile Co., 10 Texas Civ. App. 582, 31 S. W. 55; Osvald v. Williams, 187 S. W. 1001; Simon v. Temple Lumber Co., 146 S. W. 592.

■ There is no seizure of the property of defendants in error without due process involved. The decree of the district court holding their properties subject to attachment and garnishment is absolutely void on the face of the judgment roll, is no decree at all, and does not bind either them or the garnishees. Only its attempted enforcement could endanger their properties, to prevent which they have the usual remedies against the execution of void judgments. We do not think the cases cited by appellees, viz., Davis v. Wechsler, 263 U. S. 22, 44 Sup. Ct. 13,

68 L. Ed. 143; Michigan Central R. R. Co. v. Mix, 278 U. S. 492, 49 Sup. Ct. 207, 73 L. Ed. 470; Riverside Mills v. Menefee, 237 U. S. 189, 35 Sup. Ct. 579, 58 L. Ed. 910; McDonald v. Mabee, 243 U. S. 90, 37 Sup. Ct. 343, 61 L. Ed. 608, L. R. A. 1917F, 458, to be in point to the issue here involved, or that they overrule the principle declared in the York case (137 U. S. 15), sustaining the validity of the Texas statutes.

The case of McNeal-Edwards Co. v. Young, 42 Fed. (2d) 362, 371, is of no probative value. The case was reversed on certiorari by the Supreme Court. 283 U. S. 398, 51 Sup. Ct. 538, 75 L. Ed. 1140.

The propositions of defendants in error, in so far as they relate to the subject of this immediate discussion, are overruled.

The judgment of the district court, in so far as it overruled the pleas *in limine* of defendants in error, and in so far as it held that the defendants in error Standard Oil Company of New Jersey, the Socony Vacuum Company, and the Standard Oil Company of California could not appear specially without submitting themselves generally to the jurisdiction of the court is affirmed. The judgment of the district court, however, in overruling the motions to vacate and quash the attachment and garnishment writs involving the above-named defendants in error, described above, is reversed, and said writs are vacated and annulled, and the applications therefor dismissed. The judgment of the district court, sustaining the general demurrer to the State's petition, and that of the Court of Civil Appeals, affirming that decree, are reversed, and as to that the cause will be remanded as to all parties.

The judgment of the Court of Civil Appeals is reversed; that of the district court is reversed in part, reversed and rendered in part, and in part affirmed; and the cause, subject to the limitations of this opinion and the decree to be entered, is reversed and remanded to the district court.

The parties within fifteen days will prepare a decree carrying into effect this opinion, and will submit it to the clerk for approval and entry.

Opinion delivered June 16, 1937.

Rehearing overruled December 1, 1937.

---

[1]CODE OF PRACTICES FOR MARKETING REFINED PETROLEUM PRODUCTS REFERRED TO IN THE ABOVE OPINION.

"GROUP I. Rule 1. The practice of loaning or leasing gasoline pumps, tanks and other equipment is unsound and uneconomic, and should be discontinued at the earliest possible moment, consistent with existing conditions. Until such time as this situation can be brought about, and only in those states in which the practice

is now observed, gasoline or kerosene pumps and tanks, motor oil equipment and grease outfits (the grease outfits not exceeding in cost $50 each) may be loaned or leased for the exclusive storage and handling of the products of the lender or lessor, but the borrower or lessee shall not be prohibited from handling in other equipment the products of another supplier. Where no equipment is at present installed by any company, or where additional equipment may be added to existing locations, the borrower or lessee shall be required to pay for the installation of each loaned or leased equipment the actual cost of installing said equipment, and for this purpose shall make a cash deposit of at least $100 in advance for each underground unit to be installed, and shall pay, as or when due, all privilege taxes attaching because of the installation or maintenance of such equipment."

"GROUP II. Rule 7. Refining companies, wholesalers, distributors, and/or jobbers may acquire by bona fide leases or sub-leases, service and filling stations or sites for same, and such stations and/or sites may be leased or licensed by such company to dealers for the purpose of distributing its products. Such stations and/or sites shall not be acquired at one rental and then sub-leased or licensed at a reduced rental for the purpose of secretly rebating. In the event the company makes improvements to such properties prior to sub-leasing same, such sub-lease shall provide in addition for reasonable return upon the cost of such improvements, in order that the transaction may not result in rebating."

"Rule 8. On account of the special nature of service required in supplying petroleum products to airports, no dispensing or storage equipment of any kind shall be leased, loaned, or otherwise furnished to airport operators or resellers of petroleum products, except at full cost, including cost of equipment and storage installation."

"Rule 9. A lender or lessor of equipment shall neither extend credit to the borrower or lessee for installation costs, nor advance money to him to cover payment of privilege taxes, or any other expenses in any manner related to the installation of loaned or leased equipment.

"It is not the intention of Rule 1 and Rule 9 to require the payment of installation costs from the borrower or lessee for exchanges and/or substitutions in existing equipment on locations where gasoline, kerosene or lubricating oils are being sold upon the date of the Federal Trade Commission's approval of this code. The privilege of exchange or substitution of equipment is declared to extend to all dealers, not merely to the original lenders."

"Rule 10. Except as may be provided in Rule 7, refiners, wholesalers, distributors, and/or jobbers shall not construct for retailers any driveways, canopies, sheds, greasing pits, building or other structures; do painting other than their standard signs or loaned equipment; make improvements to existing structure facilities; nor furnish or loan air compressors, greasing lifts or racks, or other things of value, except equipment stated in Rule 1 hereof, nor bear any part of the expense of construction work on the premises of resellers, nor loan money for the same."

"Rule 11. No equipment except trade-marked pump globes and other standard advertising devices shall be loaned to tank car buyers and/or distributors."

"Rule 12. Refiners, distributors, jobbers, and/or wholesalers shall not pay rentals or make any allowance for the privilege of installing pumps and tanks, or for displaying advertising on premises where refined products are sold."

"Rule 13. Refiners, distributors, jobbers, and/or wholesalers shall not rent from any dealer or consumer any delivery equipment, and shall not purchase from any dealer or consumer any delivery equipment for more than its actual value."

"Rule 14. Refining companies, wholesalers, distributors, and/or jobbers may own service and filling stations or sites for same, and may lease such stations and/or sites to dealers for purposes of distributing its products, provided that such leases shall stipulate for a reasonable return to the lessor upon the then fair value of the property for filling station purposes."

"Rule 16. No oil or other thing of value shall be given away, or special inducement granted, on opening days, special sale days, or other occasions."

"Rule 17. All refiners, distributors, jobbers, and wholesalers shall conspicuously post, at each point from which they make delivery, the several posted prices of

gasoline and kerosene for each class of delivery for such deliveries at the time of delivery.

"Retailers and other operators serving consumers through service stations, garages, curb pumps, or pumps located at bulk plants, shall conspicuously post, at the place from which delivery is made, prices at which gasoline, kerosene, and motor oils are sold."

"No seller shall make any deviation from his posted prices (whether wholesale or retail) by means of secret rebates, allowances, bonuses, concessions, benefits, unusual credits, scrip books, or any plan, device, or other scheme which may directly or indirectly permit the buyer to obtain gasoline or kerosene at a lower net cost to him.

"Commercial accounts, whether for delivery at service stations or otherwise, may be recognized as an exception to this rule in sections where they are now in vogue, but shall apply only to written contracts for charge accounts."

"Rule 19. Coupon books or other scrip of any nature, if used, shall be sold and redeemed at their face value without any discount."

"Rule 20. On a change in the posted price, no adjustments, allowances, credits or refunds shall be given to any buyer on deliveries already made."