

# The Attorney General of Texas

December 31, 1982

**MARK WHITE**
Attorney General

Supreme Court Building
P. O. Box 12548
Austin, TX. 78711- 2548
512/475-2501
Telex 910/874-1367
Telecopier 512/475-0266

1607 Main St., Suite 1400
Dallas, TX. 75201-4709
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905-2793
915/533-3484

1220 Dallas Ave., Suite 202
Houston, TX. 77002-6986
713/650-0666

806 Broadway, Suite 312
Lubbock, TX. 79401-3479
806/747-5238

4309 N. Tenth, Suite B
McAllen, TX. 78501-1685
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205-2797
512/225-4191

An Equal Opportunity/
Affirmative Action Employer

Mr. E. D. Walker
Chancellor
The University of Texas System
601 Colorado Street
Austin, Texas    78701

Opinion No. MW-548

Re:  Recent legislation affect-
ing Optional Retirement Program
and  Tax  Sheltered  Annuity
Programs of state colleges and
universities

Dear Mr. Walker:

You have asked several questions regarding the effect of recent legislation on the Optional Retirement Programs (hereinafter O.R.P.) and Tax Sheltered Annuity Programs (hereinafter T.S.A.P.) of state colleges and universities. You first ask whether the conditions for benefit availability imposed by section 36.105 of Title 110B, Public Retirement Systems, V.T.C.S., control the availability of <u>all</u> O.R.P. benefits to participants in such a program.

Because of recent statutory amendments, chapter 36 of Title 110B now permits the governing board of a state-supported college or university to provide for contributions to or purchase of two different types of investments on behalf of the O.R.P. participants. The board may provide for contributions to any type of investment authorized in section 403(b) of the Internal Revenue Code, such as mutual funds or money market funds, or it may provide for the purchase of fixed or variable retirement annuities. Prior to 1981, a governing board administering an O.R.P. could provide only for the purchase of annuities, not for contributions to all investments authorized by section 403(b) of the Internal Revenue Code. However, chapter 36 of Title 110B now allows a choice of investments, according to the following sections of the statute:

Section 36.002.  Optional Retirement Program

(a)  The  optional  retirement  program established  as  provided  by  this  subtitle  shall provide  for  contributions  to  any  type  of investment  authorized  in  Section  403(b)  of  the federal  Internal  Revenue  Code  of  1954,  42  [sic] U.S.  Code,  as  it  existed  on  January  1,  1981,  and for  the  purchase  of  fixed  or  variable  retirement annuities  that  meet  the  requirements  of  that

section and Section 401(g) of the federal Internal Revenue Code of 1954, 42 [sic] U.S. Code, as amended.

. . . .

Section 36.004. Administration

(a) A governing board may provide for contributions to any type of investment authorized in Section 403(b) of the federal Internal Revenue Code of 1954, 42 [sic] U.S. Code, as it existed on January 1, 1981, and may arrange the purchase of annuity contracts from any insurance or annuity company that is qualified to do business in this state.

As a result of the expanded investment authority of a governing board, an O.R.P. participant may collect either annuity benefits or other investment benefits. Your question involves the availability of the different benefits to a participant in an O.R.P.

Section 36.105 of Title 110B governs availability of benefits under an O.R.P. That section defines termination of participation in an O.R.P. and stipulates that benefits are available to a participant only upon termination of participation. The pertinent parts of the statute are as follows:

(a) A person terminates participation in the optional retirement program, without losing any accrued benefits, by:

(1) death;
(2) retirement; or
(3) termination of employment in all institutions of higher education.

. . . .

(c) The benefits of an annuity purchased under the optional retirement program are available only if the participant terminates participation in the program as provided by Subsection (a) of this section. (Emphasis added).

Although subsection (c) restricts the availability of annuity benefits, it fails to restrict similarly the availability of other investment benefits. Your question, then, is whether subsection (c) should be interpreted as controlling the availability of all investment benefits, or whether the benefit availability restrictions

of Internal Revenue Code section 403(b) are controlling for benefits from investments other than annuities.

We are of the opinion that I.R.C. section 403(b) is not controlling and that section 36.105(c), Title 110B, Public Retirement Systems, V.T.C.S., is controlling on the availability of all investment or annuity benefits.

Section 403(b) of the Internal Revenue Code requires that a custodial account to which qualified employers make contributions on behalf of their employees restrict the availability of benefits in order to have the contributed amounts obtain the desired federal tax treatment. The relevant part of section 403(b) is as follows:

> (7) Custodial accounts for regulated investment company stock.
>
> (a) Amounts paid treated as contributions. -- For purposes of this title, amounts paid by an employer described in paragraph (1)(A) to a custodial account which satisfies the requirements of section 401(f)(2) shall be treated as amounts contributed by him for an annuity contract for his employee if --
>
> > (i) the amounts are to be invested in regulated investment company stock to be held in that custodial account, and
> >
> > (ii) under the custodial account no such amounts may be paid or made available to any distributee before the employee dies, attains age 59½, separates from service, becomes disabled (within the meaning of section 72(m)(7)), or encounters financial hardship.

It is apparent that section 403(b) permits the conditions for distribution of benefits from the custodial account to be less stringent than the conditions for availability of benefits from the O.R.P. itself. If the code section 403(b) conditions were to apply to other investment benefits and the section 36.105 conditions were to apply to annuity benefits, there would be two different availability standards for the benefits. There is nothing in chapter 36 of Title 110B to indicate that the legislature intended to have the different benefits available according to different conditions. The legislature did not expressly adopt the 403(b) standards for availability of other investment benefits, just as it did not expressly expand the scope of the availability restrictions in section 36.105 to include other investment benefits. Thus, we are presented with the question of which set of conditions, if any, can we infer that the legislature

intended to be controlling for the availability of other investment benefits, since neither set of conditions was expressly made applicable to those benefits.

The legislature certainly intended that some sort of availability restrictions apply to any type of benefits that may be distributed under an O.R.P. The purpose of the O.R.P. legislation, as stated in section 36.001 of Title 110B, is to establish a complete retirement program for faculty members employed in state-supported colleges and universities as an incentive to attract high quality faculties and improve the level of education at the institutions. As evidenced by section 36.105, the legislature considers controls on the availability of benefits to be a necessary part of a complete retirement program. Our office has also considered such controls to be an important part of an O.R.P. and a part necessary to achieving the program's basic goals. Attorney General Opinion H-1060 (1977) stated that benefits accumulated under an O.R.P. should not be available to a participant prior to termination; to make contract benefits available to participants before retirement would be inconsistent with the purpose underlying retirement systems, which is to provide security upon retirement. See Attorney General Opinion H-532 (1975). Thus, in order to preserve the financial integrity of the O.R.P.'s and to carry out the express purpose of the statute, the legislature certainly intended that the O.R.P. place some type of restrictions on the availability of the newly permitted investment benefits and that those restrictions limit the availability of benefits to the time of termination of employment.

Given that some restrictions should apply to the availability of the other investment benefits and that the legislature did not expressly make applicable the restrictions of either I.R.C. section 403(b) or of section 36.105 of Title 110B, we consider it more likely that the legislature intended to have the section 36.105 availability conditions apply to the other investment benefits than to have the section 403(b) conditions apply.

According to Calvert v. British-American Oil Producing Company, 397 S.W.2d 839 (Tex. 1965), the intention of the legislature should be ascertained from the entire statute, not isolated portions thereof. Under section 36.105, the definition of termination of participation is not restricted to employees investing in annuities; it covers those contributing to the other types of investments also. The only part of section 36.105 that is restricted to annuity benefits is subsection (c), which provides that those benefits are available only upon termination as defined by section 36.105(a). Almost every provision of chapter 36 applies with equal force to annuities and other investments purchased under an O.R.P. The administration, participation, and contribution provisions indicate that an O.R.P. is to be operated under one set of guidelines, regardless of the type of benefits that are forthcoming to its participants. In the absence of

some inherent reason to impose two different benefit availability standards and in the absence of an expression of intent by the legislature to do so, we conclude that the legislature intended to maintain a single system of regulation for the O.R.P.'s, including a single regulation for benefit availability.

The more stringent standards for benefit availability under an O.R.P. are not incompatible with the standards under I.R.C. section 403(b). The terms of section 403(b) indicate that the restrictions should be imposed by the custodial account itself as minimum availability standards. Once those minimum standards have been established, a program such as the O.R.P., through which an employer makes contributions to the custodial account, may itself establish availability criteria at least as stringent or more stringent than those established by section 403(b) and still be compatible with the Internal Revenue Code.

On the other hand, the less stringent provisions of Internal Revenue Code section 403(b), if considered to be binding maximum restrictions on O.R.P. benefits, would appear to be incompatible with the general goal of the O.R.P. of creating a complete retirement system that restricts benefit availability to the time of termination. For example, under the financial hardship provision of section 403(b), an employee might be able to obtain investment benefits for the purpose of purchasing a residence or providing higher education for his or her children. See H.R. Conf. Rep. No. 95-1800, reprinted in [1978] U.S Code Cong. and Ad. News 7198, 7218. Such a situation would frustrate the O.R.P.'s goal of providing a retirement program and would render meaningless the idea of retirement benefits as pay withheld to induce continued faithful service. Teacher Retirement System v. Duckworth, 260 S.W.2d 632 (Tex. Civ. App. - Fort Worth 1953), aff'd, 264 S.W.2d 98 (Tex. 1954). The purpose of a teacher retirement system, for which the O.R.P. provides an alternative type of investment, is to provide support for teachers after their teaching days are over. Duckworth, supra. The legislative intent in creating such a system was to provide security for teachers and to encourage qualified persons to become and remain teachers in the public schools. Woods v. Reilly, 218 S.W.2d 437 (Tex. 1949).

In light of such intent and purposes, statutes regulating retirement programs or systems should be construed liberally in order to carry out the whole purpose of the plan. Woods, supra. In State v. Standard Oil Company, 107 S.W.2d 550 (Tex. 1937), the court stated that when the purpose of a statute is ascertained, the meaning of words used may be restricted or enlarged or words may be disregarded to give the statute the meaning that effectuates its purpose. Thus, we read section 36.105 of Title 110B to mean that benefits under the optional retirement program are available only upon termination of participation; the word "benefits" refers to those from an annuity or from other available investments.

The bill analysis to the legislation which first enacted the language now codified as section 36.105 supports our conclusion. House Bill No. 1719 of the Sixty-seventh Legislature amended section 51.358 of the Education Code, now codified as section 36.105. Acts 1981, 67th Leg., ch. 441, at 1864. The portion of the bill analysis entitled Purpose/Synopsis states as follows:

> The optional retirement program for faculty members at public institutions of higher learning, in which both employer and employee contribute into the individual's retirement account, at set rates is, under this bill, freed from being used only for the purchase of retirement annuities and may be used to make any type of general investment authorized in section 403(b) of the IRS Code of 1954.
>
> There may be not only different investment plans set up for each institution, but for each component of an institution.
>
> An individual may collect the full benefits of these plans only if he or she dies, retires or terminates employment due to disability. Otherwise, the employee may withdraw only his or her accumulated contributions. (Emphasis added).

This item of legislative history indicates that the legislature intended the benefits of all plans under the O.R.P. to be available only upon death, retirement, or termination of employment.

Your second question asks whether the board of regents may define the term "financial hardship" that is used in the Internal Revenue Code, if the availability of O.R.P. investment benefits is governed by I.R.C. guidelines. Our answer to your first question renders unnecessary an answer to this question.

You next ask whether the companies offering expanded investment opportunities under an O.R.P. or T.S.A.P. are required by law to be "qualified and admitted to do business" in the State of Texas. Neither article 6228a-5, V.T.C.S., which authorizes the operation of a T.S.A.P., nor chapter 36 of Title 110B, V.T.C.S., which authorizes the operation of an O.R.P., specifically requires that a company offering 403(b) investments be qualified and admitted to do business in the state, although chapter 36 does require that an insurance or annuity company selling the annuity contracts must be "qualified" to do business here. We are of the opinion that the legislature did not intend that a company offering the 403(b) investments meet the same "qualifications" to do business in the state as an insurance or annuity company.

An insurance company that is offering annuities to participants in an O.R.P. or T.S.A.P. must be authorized to do business in this state and becomes authorized to do so by meeting certain financial and administrative requirements and then obtaining the approval of the State Board of Insurance to begin operations. We do not believe that the companies offering the other kinds of investments under 403(b) will, simply by virtue of offering such investments, be acting as insurance companies. Thus, there is no authorization for the State Board of Insurance to require those companies to "qualify" under the Insurance Code to do business as insurers in this state. We therefore cannot assume that the legislature, through either chapter 36 or article 6228a-5, intended to impose the same requirement of being qualified to do business in Texas on the companies offering the expanded investment opportunities as are imposed on insurance and annuity companies, because the qualifications, as they relate to an insurance company, would be inherently inapplicable to a company presumably not involved in an insurance business. Of course, if the company were to be engaged in an insurance business, as well as engaged in the sale of the 403(b) investments, the provisions of the Insurance Code would be applicable of their own accord, without resort to either chapter 36 or article 6228a-5.

Your question under review at this point is phrased in terms of whether companies are required "by law" to be qualified and admitted to do business in the state. You do not request us to address any particular law or laws. Although we are of the opinion that the O.R.P. and T.S.A.P. laws do not specifically require such companies to be qualified and admitted to do business in the state, the laws regulating foreign corporations, as well as the laws regulating the sale of securities, would be applicable to such companies. The Texas Securities Act, article 581-1 et seq., V.T.C.S., and the regulations promulgated thereunder, in particular regulation under 7 T.A.C. §123.1 (1980), the administrative guidelines for registration of open-end investment companies, requires registration of securities sold in this state. Article 8.01 of the Texas Business Corporation Act requires a foreign corporation to obtain a certificate of authority before being allowed to transact business in the state. These statutes to the extent applicable to a particular company, require a company offering the expanded investment opportunities to be "qualified" to do business in the state of Texas. Furthermore, there may be other statutes, the application of which depends upon the activities of the company, that may affect the operation of these companies. Without particular facts, we cannot state that no laws other than those specifically mentioned will affect these companies.

In light of the wide-ranging regulation afforded by the laws of this state, a company offering the 403(b) investments does subject itself to statutes requiring some sort of "qualification" for the company to do business in this state, even though neither article 6228a-5, V.T.C.S., nor chapter 36 of Title 110B, V.T.C.S.,

specifically require such qualification. In your fourth question you have asked whether the board of regents may require such qualification to do business or the posting of some sort of bond if the law does not require such qualification. Because we are of the opinion that various statutes do require the investment companies to be qualified to do business in this state, we do not consider it necessary to answer your fourth question.

## S U M M A R Y

The availability of benefits under an O.R.P. is regulated by section 36.105 of Title 110B, V.T.C.S., regardless of whether those benefits are annuity benefits or other investment benefits. Neither chapter 36 of Title 110B, V.T.C.S., nor article 6228a-5, V.T.C.S., specifically require a company offering the expanded investment opportunities to be "qualified" to do business in the state; however, those companies remain subject to the laws generally regulating corporations transacting business in this state and the laws regulating the sale of securities in this state.

Very truly yours,

MARK WHITE
Attorney General of Texas

JOHN W. FAINTER, JR.
First Assistant Attorney General

RICHARD E. GRAY III
Executive Assistant Attorney General

Prepared by Charmaine Rhodes
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Susan L. Garrison, Chairman
Rick Gilpin
Patricia Hinojosa
Jim Moellinger
Charmaine Rhodes