

**NUMBER 13-07-00703-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**ROBERT PUCKETT, JAMES JULIUS
PUCKETT, JR., INDIVIDUALLY AND D/B/A
PUCKETT RANCH PROPERTIES, MERRILL
JOHN STOKES, A/K/A BUTCH STOKES, AND
CBM COMFORT, INC., D/B/A RANCHBUYERS
REAL ESTATE, A/K/A RANCHBUYERS.COM,** Appellants,

**v.**

**QUINT BURRIS, INDIVIDUALLY
AND D/B/A QB PROPERTIES,** Appellee.

---

**On appeal from the 377th District Court
of Victoria County, Texas.**

---

# MEMORANDUM OPINION

**Before Justices Yañez, Garza, and Vela
Memorandum Opinion by Justice Yañez**

Appellants, Robert Puckett, James Julius Puckett, Jr., individually and d/b/a Puckett Ranch

Properties, Merrill John Stokes, a/k/a Butch Stokes,  and CBM Comfort, Inc., d/b/a

Ranchbuyers Real Estate a/k/a Ranchbuyers.com ("Ranchbuyers"), challenge the trial

court's judgment in favor of appellees, Quint Burris, individually and d/b/a QB Properties.[1]

We affirm.

## I. BACKGROUND

Larkin Thedford, an attorney, and the Hartnett Law Firm ("the Firm") represented

the Velma Lee and John Harvey Robinson Charitable Foundation ("the Foundation") in a

will contest.  In that proceeding, the Foundation was awarded ownership of property known

as the "Robinson Ranch," which included nineteen acres of land in Jackson, Victoria, and

Hayes Counties, Texas.  The Foundation assigned a percentage interest in the Robinson

Ranch to the Firm and Thedford for providing legal services.  According to Thedford, the

owners, including the Firm and the Foundation, eventually agreed to sell the Robinson

Ranch.  Thedford testified that after the owners discussed the sale of the Robinson Ranch,

it was understood that Dan Braman would be given the first opportunity to purchase the

property.

Thedford then told his step-son-in-law, Burris, a real estate broker, to ask Robert,

Braman's real estate agent, if Braman was interested in buying the Robinson Ranch.[2]

Burris contacted Robert and informed him that Braman would be given the first opportunity

to purchase the Robinson Ranch.  Robert went to Burris's office and acquired appraisals

---

[1] Robert and James have submitted a single brief.  We will refer to them collectively as "Puckett."

[2] In their briefs, Puckett and Stokes emphasize that Thedford wanted to help Burris and his step-daughter make money.

2

of the property, and at Burris's request, Robert signed a "Confidentiality Agreement."[3]

The Robinson Ranch was eventually sold to SMZ Investments, L.P. ("SMZ") in August 2006. Thedford later discovered that Burris was not listed as a broker receiving payment of a commission for the sale.[4] SMZ immediately re-sold the property to "High Country & Cattle" (the "second sale") for thirty-six million dollars; Stokes, Sara Friend a real estate agent for Prudential Classic Realty, and Carlos Jackson Klutts divided a four percent commission on that sale.[5] Stokes split his share of the commission with Robert. Burris

---

[3] The agreement states, in pertinent part:

> [Robert] and Puckett Ranch Properties . . . expressed a desire to investigate a possible acquisition of the Robinson Ranch. . . . This Confidentiality Agreement will confirm [Burris], QB Properties and [Robert], Puckett Ranch Properties mutual understanding and agreement in connection with "Receipt of Information" regarding the real estate. [Robert] and Puckett Ranch Properties hereby acknowledge that he has entered into this Confidentiality Agreement.
>
>> 1. "Information" means all oral or written data, reports, records, or materials and any other nonpublic information or data received by [Robert] and Puckett Ranch Properties.
>>
>> 2. Information is being furnished solely in connection with consideration of the acquisition of real estate. No portions of this information shall be disclosed to other[s] except to those persons or organizations whose knowledge of the information is required to evaluate the potential acquisition or as required by law or government authority and who shall assume the same obligations under the Agreement. The undersigned hereby assumes full responsibility for the compliance to the terms of this Agreement.
>>
>> 3. It is understood that [Burris] and QB Properties' rights are being protected.

[4] On page ten of plaintiff's Exhibit 8, a "Farm and Ranch Contract," "Ranch Buyers Real Estate" (Stokes's company) is designated as the "Listing or Principal Broker" representing only the seller. The document further provides that Prudential Classic Realty is the "Other Broker" and represented only the buyer. It also provided that the buyer would pay the "Listing/Principal Broker" and the "Other Broker" each two percent of the sales price. However, there is no explicit mention of Burris or Robert. Carlos Jackson Klutts, a real estate broker, is also not mentioned in the document; nonetheless, Sara Friend, the agent working for Prudential Classic Realty and Klutts, signed a commission sharing agreement after closing, which instructed the title company to pay a commission of one percent of the sales price to Klutts.

[5] Stokes notified Klutts, a real estate broker, that the Robinson Ranch was for sale. Klutts then contacted Friend, a real estate agent with Prudential Classic Realty, who represented SMZ, the buyer in the first sale.

subsequently filed suit for breach of contract, fraud, and negligent misrepresentation against the appellants, asking for fifty percent of the commission that appellants earned on both sales.[6]

After hearing the evidence, the jury answered eleven questions in the charge in favor of Burris.[7] Burris filed an amended motion for judgment on the verdict and a request for an additional finding, asking the trial court to: (1) make an additional express finding that James was the sponsoring broker for Robert; and (2) render judgment on the theory of fraud. The trial court ordered that Burris recover actual damages of $362,500 and interest of $32,282.[8] Appellants, including James, were held jointly and severally liable. This appeal ensued.

## II. THE EVIDENCE

### A. Burris

At trial, Burris, testified that he contacted Robert in October 2005, after Thedford informed him that the Robinson Ranch was for sale. Robert told Burris that Braman was "very interested in the ranch and wanted to know the purchase price." Robert informed

---

[6] Burris also sued Sue Seeliger, who is not a party to this appeal.

[7] The jury found that: (1) Burris had an agreement with Robert and Stokes to share commissions from the sale of the Robinson Ranch; (2) Burris "did not fail" to disclose to his client that he intended to receive a commission from a person other than his client or failed to obtain the consent of his client to do so; (3) Robert and Stokes failed to comply with the agreement to share commissions from the sale of the Robinson Ranch; (4) Robert and Stokes committed fraud against Burris; (5) Robert and Stokes made a negligent misrepresentation on which Burris justifiably relied; (6) the sum of $362,500 would fairly and reasonably compensate Burris for his damages that resulted from Robert's and Stokes's failure to comply with the agreement; (7) the sum of $362,500 would fairly and reasonably compensate Burris for his damages that were proximately caused by the fraud; (8) the sum of $417,500 would fairly and reasonably compensate Burris for damages that were proximately caused by the negligent misrepresentation; (9) Robert and Stokes were part of a conspiracy to commit fraud that damaged Burris; (10) the reasonable fee for the necessary services of Burris's attorney is $55,000; and (11) there was clear and convincing evidence that the harm to Burris resulted from Robert's fraud.

[8] The trial court ordered a take-nothing judgment in favor of defendant Seeliger.

Burris that Braman was "ready to go" and that Robert "talked about how much money [the two men] were going to make together as a team." Burris believed that Robert represented Braman. After several months passed, Burris told Robert that the mineral rights were not included in the sale of the Robinson Ranch, and according to Burris, Robert stated that was not a "problem."

In March 2006, Thedford instructed Burris to give Robert a copy of the appraisals for Braman to review. On March 28, 2006, when Robert picked up a copy of the appraisals and signed the "Confidentiality Agreement," Burris, while in Robert's presence, crossed out "Puckett Ranch Properties" and wrote "Ranchbuyers.com" because Robert informed him that he had "moved his license to Ranchbuyers.com." Burris wanted to protect his rights to "[a]ny commissions [he] was going to get. . . . Protect [himself] legally for giving [Robert] that information to make sure that it wasn't going to any other people besides himself and who he represented." After Robert signed the "Confidentiality Agreement," Burris provided him with a copy of the appraisals. Upon Robert's request, Burris emailed a copy of the appraisals to Stokes, whom Robert described as his "partner."

Thedford, Burris, and Robert agreed to meet to discuss the sale of the property to Braman. Robert told Burris that Stokes wanted to attend the meeting "because [Stokes] does all the contracts and everything for Robert." When Thedford entered the meeting room, he saw Stokes and "looked at him kind of concerned and wanted to know who this fellow was. And Robert said, he's with me." When Thedford asked Stokes why he was at the meeting, Stokes stated that he was there for Braman.

Stokes indicated that he was "prepared" to give a $30 million offer to buy the Robinson Ranch. Thedford stated, "[T]his is the deal. [Burris] is my son-in-law and Robert

5

we brought this deal together. . . . I want to make sure you and [Burris] have everything worked out, everything is good between y'all two. I want everything to go through [Burris]. This is [Burris's] deal. We're going through [Burris] to make this deal happen." Burris stated, "Everybody shook their heads, said yes, sir, we're all in agreement." After hearing the offer, Thedford asked if there was any commission, and Burris and Stokes said "[Yes,] we want a 6 percent commission; 3 percent for QB Properties and 3 percent for Ranchbuyers.com." Thedford stated that he would present the offer to the Firm and tried calling Jim Hartnett, who was not available at the time.[9] The meeting ended.

Thedford informed Burris that his name was not included in the contract that was submitted. Burris called Robert, who stated that Robert's name was not on the contract either, and that Robert did not know if he was going to get paid. Robert then told Burris that "if [Robert] got anything he might give [Burris] 20 percent referral fee of whatever he gets, and that's all [Burris] deserve[d]." Burris faxed Stokes a commission sharing agreement, which Stokes refused to sign. Robert told Burris that Stokes "[was] not going to pay [Burris] a dime."

In August 2006, Thedford sent Burris a copy of the "U.S. Department of Housing and Urban Development Settlement Statement" showing that the buyer paid one percent commission to Klutts and Prudential Classic Realty and two percent commission to Ranchbuyers Realty. According to Burris, the document he received did not include information concerning who purchased the property.

Burris stated that he had discussed the sale of the Robinson Ranch with two other potential buyers, but that he had not disclosed the location of the property or the details

---

[9] Hartnett was a lawyer that represented the Firm in the sale of the Robinson Ranch.

6

because Braman was given the first opportunity to purchase the property. Burris stated that the Robinson Ranch had not been listed or advertised anywhere.

Burris testified that he had an agreement to share a commission on the sale of the Robinson Ranch with Robert "from the beginning" and that Robert never told Burris that Robert could not share the commission with him. Burris stated, "[I]t was assumed between both of us [Robert and Burris] that we were going to split the commission fifty-fifty." Burris believed that he was entitled to half of the commission that Robert and Stokes received because that was the agreement. According to Burris, had Robert informed him that he would not share the commission with him, Burris would not have provided the appraisals to Robert and would have stopped dealing with Robert.[10]

## B. Robert Greer

Greer, a real estate broker, testified that Burris had told him that some property was for sale; however, Burris never revealed where the property was located. Greer worked with Andy Murphy, a real estate broker from Florida. Murphy represented real estate investors and told Greer that he had a buyer who was interested in purchasing a large tract of land. Burris provided Greer with copies of the appraisals and Steve Kopp took pictures of the property for the investor to review. Kopp informed Greer that the response from Murphy was "favorable." Because a contract for sale of the Robinson Ranch had already been written "Greer would show the property to Murphy's client or to other investors who were interested if the contract "fell through." Greer told Murphy that the sale price was

_____

[10] The appraisals admitted as plaintiff's Exhibits 4 and 5 include: (1) several maps and pictures of the Robinson Ranch; (2) identification of the property with a description of its exact location; (3) a description of the property including, among other things, the total acres, the types of soil, the topography, easements and encumbrances, hazards; and (4) other information useful to a potential buyer. Burris testified that Exhibit 4 was the appraisal of the Jackson and Victoria County properties, while Exhibit 5 was the appraisal of the Hays County properties.

7

thirty-six and one-half million dollars net to seller; Greer believed Murphy was "fine" with that number. Once Greer discovered that the sale of the Robinson Ranch had closed, there was no reason to continue.

## C. Dan Hatfield

Hatfield, a real estate broker, testified that he is an accredited land consultant who specializes in farm and ranch real estate.[11] Hatfield explained that farm and ranch realty is

> kind of antiquated in the way we do a lot of our business. A lot of the business that's done in residential is done electronically, very fast, very quick based. You sell something this afternoon, close it in two days. . . . Farm and ranch is not that way. Farm and ranch is very traditional. . . . A lot of the listing agreements are not signed and they're not a signed listing agreement. In other words, somebody says, please sell my place, I'll pay you. It's done on a handshake. It's done on an honor basis. A lot of the agreements between brokers works [sic] the exact same way. One broker contacts the other, says, will you help me sell this place, we'll split a commission without ever having any formalized written agreement. . . .

According to Hatfield, in a real estate sale, the seller usually pays the commission; however, the buyer in some instances will pay the commission. In either event, the seller's and buyer's brokers will share the commission with each other.

Hatfield identified plaintiff's Exhibit 8 as "the standard promulgated farm and ranch contract form from the Real Estate Commission." Hatfield stated that page ten of the contract was an addendum, which may include "sole and separate contracts and agreements. . . . These [agreements] are between other people involved in the transaction. [They c]an be between the different brokers involved as well as a receipt for

---

[11] According to Hatfield, "The Realtors Land Institute bestows upon people who have gone through the educational requirements and have shown the strict requirements as far as number of land sales you have conducted, et cetera, to bestow upon those people who have gone through that educational process and met those requirements to be able to be an accredited land consultant."

8

the escrow money with the escrow company, et cetera."

## D. Klutts

Klutts testified that Stokes told him that the Robinson Ranch was for sale and asked if Klutts knew of a buyer. Klutts called Friend, who indicated that she had a client who was interested in buying some ranch property.[12] Klutts called Stokes and stated, "this man [Friend's client] is keenly interested. [Friend] talked to him. He wants to pursue doing a contract on this place, and we need to proceed forward on it." Stokes told Klutts that someone else had "first shot at this place" and that he needed to contact that person. A couple of days later, Stokes informed Klutts that the "man [that had first shot] had decided not to pursue the purchase of the Robinson Ranch." Klutts asked Friend to contact Stokes to make a deal, and Klutts "step[ped] back" from the transaction.

Friend orally agreed to split any commission that was made on the sale of the Robinson Ranch with Klutts. After the contract selling the property to SMZ was signed, Friend signed a commission sharing agreement with Klutts; Klutts had written the agreement so that he could furnish it to the title company to ensure that he received his payment. Klutts understood that he and Friend were "bringing the purchaser to the table" while Stokes was "the one who knew about the property and told [them] about the property and said he needed a buyer for that property."

## E. Thedford

Thedford testified that he had talked to Robert about the Robinson Ranch "through the years," and Robert told Thedford that he wanted to work with him on the sale of the property. The owners eventually agreed to sell the property, and Thedford was "given the

---

[12] Friend split her share of the commission with Klutts.

9

authority to submit to the broker or whoever [he] was working with the bottom line that we would take and [Braman] had the option to take it or not take it." Thedford had Burris contact Robert and they held a meeting at Thedford's office. However, Thedford did not "commit the Foundation to pay a commission," and Thedford informed Burris that the Foundation would not pay a commission.

Robert told Thedford that "he worked with [Stokes] on various things and [Stokes] had done some work for [Braman], so [Stokes] was going to help [Robert] present the sale to [Braman]." Furthermore, neither Stokes nor Robert informed Thedford that Stokes was not representing Braman, that Braman was not interested in purchasing the property, or that there was another buyer presenting an offer. Thedford did not find out that Braman had not purchased the property until after the "final contract had already been signed."

## F. Kim Kubecka

Kubecka, Burris's employee, testified that she assists Burris by typing documents for him and that she typed the "Confidentiality Agreement" between Burris and Robert. Kubecka heard Robert tell Burris that Robert was not a broker and that his "license was held by [Stokes] and Ranchbuyers.com." Kubecka thought that she would have to re-type the document because Robert was now working for Ranchbuyers.com. She heard a discussion wherein Robert told Burris to "scratch out" "Puckett Ranch Properties."

## G. Mike Crane

Crane, Robert's friend and Burris's brother-in-law, testified that Robert told him that he signed the "Confidentiality Agreement" and stated that he had the authority to sign for the "ranch people, ranch properties."

## H. Hartnett

10

Hartnett testified that the sellers received multiple verbal offers and a few in writing to purchase the property. They decided to sell it, and Thedford was

> asked to let people know that the property was possibly for sale. And so that would authorize him . . . to contact this [Burris] fellow or [Robert] or multiple other people. . . . At a later point in time, [Thedford] was authorized specifically to convey an offer to the group that we thought was [Braman] of the specifics of what the offer was, and that was 35 million, we would not pay commission. . . .

Hartnett did not discover that Braman was not the buyer of the property until after the contract for sale was signed. According to Hartnett, if he had known that Braman was not the buyer, he would not have dealt exclusively with SMZ. Hartnett stated, "I think I would have definitely pitted people against each other to—to try and achieve a slightly higher price. . . . [W]e dealt with [Braman] slightly differently than we probably would have dealt with just people coming in from the outside."

## I. Stokes

The trial court admitted Stokes's deposition testimony during Burris's case-in-chief. Stokes, a licensed real estate agent, testified that Robert informed him that the Robinson Ranch was for sale and that the "seller group" wanted to sell it to Braman, but Braman had "passed on the property because there were no minerals." Robert asked Stokes if his "large buyer group" would be interested in purchasing the property. Braman gave Stokes "permission" to work on the sale of the Robinson Ranch. Stokes stated that he met with Thedford and Burris and someone asked him "point blank, they said, do you represent [Braman]. And [Stokes] said, [Braman] is the reason that I'm here. And that's all I said."

Stokes then stated that he told Thedford that he did not represent Braman, and that Braman was not the "buying party." Later, counsel for Burris asked:

> Okay. Now there's—I want to make sure I understand this correctly because

11

in my mind there seems to be a pretty big difference between a couple of your answers.  I want to find out what you told [Thedford and Burris].  Did you specifically tell [Thedford] in response to his question, [Braman] is the reason I'm here or did you tell him no, I don't represent [Braman] but he's the reason I'm here.

Stokes responded, "Okay, I specifically remember a question being asked of me if I represented [Braman] and I said he's the reason I'm here. . . . I specifically remember that. I do not remember the other."

At trial, Stokes testified on his own behalf.  Stokes stated that he only "represents buyers" in the real estate transactions and that he has buyers that have "deep pockets." Stokes and Robert had met many years earlier, and they both dealt in ranch real estate. In early March 2006, Robert told Stokes that Thedford had informed him that the sellers of the Robinson Ranch were ready to take offers.  Stokes "went to work on it immediately" by "[building] a book of facts in [his] mind" about the ranch.  According to Stokes, he probably had one hundred meetings and made "countless" phone calls to get prepared for a presentation to a buyer.  Stokes called Klutts, who told Stokes to contact Friend.  Stokes was not aware of Burris when he made a deal with Friend, who represented SMZ, to share the commission they made on the sale.[13]

Stokes informed SMZ that Braman had the first opportunity to purchase the property and then acquired Braman's permission to attend the meeting with Thedford.  Stokes stated that he was a "surprise guest of Robert at [Thedford's] office."  Robert told Stokes that Burris would be at the meeting and had "been named as lead broker on the deal." Stokes testified that he informed Thedford and Burris that he did not represent Braman, but did state that Braman was the reason he was there.  However, Stokes was careful not

_____

[13] Stokes testified that he also represented the buyer, SMZ.

12

to reveal the identity of the buyer. The buyer authorized Stokes to make an offer of thirty million dollars, which he did. Stokes insisted that he did not have a copy of the appraisals before making the offer, and that when he finally received a copy, it was too blurry to read. Thedford informed Stokes that the sellers wanted thirty-five million dollars net to the sellers—in other words, the sellers would not pay a commission on the sale of the property. On April 5, 2006, Thedford faxed a document to Hartnett and Stokes memorializing the seller's terms.[14]

Robert informed Stokes that he had signed a "Confidentiality Agreement" with Burris, but Robert did not mention that Burris had "crossed out "Puckett Properties" and put in Ranchbuyers." Robert did not have authority from Stokes or from the broker to enter into an agreement with Burris on behalf of Ranchbuyers.[15]

Stokes believed that he had an agreement with Burris that was limited to the first offer presented at the meeting at Thedford's office. Stokes understood that the agreement he had with Burris was that they would share a six percent commission only if it was paid

---

[14] The trial court admitted the document into evidence, which states:

Mr. M.H. Brock (Buddy Brock) is the one that I am talking with for and on behalf of the foundation. Mr. Jim Hartnett Sr. and Jr. are the two that represent themselves, myself, and two other attorneys involved in partial ownership of the Foundation Property. Mr. Brock gave me the following information this morning. Mr. Hartnett Jr. gave me the information a day or so ago, which I immediately passed on to [Robert]. I have always tried to made [sic] sure that Mr. _____ had the opportunity to have last chance, which the parties have respected at this point. The above will not be shipped any further and Mr. Brock and Mr. Hartnett, say they will not seek any other purchasers if your purchaser will sign a contract in a few days.

The proposal is for a net of $35,000,000.00, no expense to the Foundation or Attorneys who own with the foundation.

    . . . .

I suggest that you call Mr. Jim Hartnett, Jr. or Sr. . . . for deadlines and etc.

[15] It is unclear from the record who was the broker for Ranchbuuyers at this time.

by the seller. Stokes believed that agreement "fell apart" when the seller refused to pay any commission on the sale of the Robinson Ranch.

When the seller refused to pay the commission, the buyer, SMZ, agreed to pay a four percent commission to Stokes and Friend. In the "Farm and Ranch Agreement," Stokes was listed as the seller's real estate agent because it was the "only form [they] have to hand somebody an offer," and Friend and Stokes "were the only two on this document and there's a second space over here and so we just put our names in each one." Stokes insisted that he was not representing the seller and that Friend was aware that he was not representing the seller. According to Stokes, the document was merely for the purposes of negotiating the deal.

After SMZ bought the Robinson Ranch, the owner of SMZ, Stephen Ziechang, wanted another real estate agent to sell the property.[16] However, Stokes spoke with Ziechang and promised to pay for necessary expenses if Ziechang allowed him to handle the sale. Ziechang agreed but gave Stokes only two weeks to find a buyer. Stokes did not have the money to pay for the expenses; Robert eventually gave Stokes the money.

On August 14, 2006, Stokes wired $649,500 to Robert. However, according to Stokes, the amount did not include a share of the commission from the sale of the property to SMZ. Instead, Stokes explained that: $50,000 of the payment was a referral fee to Robert for bringing the deal to him; $360,000 was the commission that he paid Robert on the second sale; $57,000 was reimbursement to Robert for expenses; $109,000 "[was] a number on a sale that Robert held a six percent agreement on prior to coming to us and that is in Live Oak County"; and the remaining amount, approximately $100,000, was

---

[16] Klutts testified that Ziechang was Friend's "client."

14

money that Robert had asked Stokes to "hold because sometimes he gets a little spendy and he had some things coming up and [Robert] wanted [Stokes] to hold on to some money for him."

On cross-examination, Stokes stated that although documents accounting for the money he wired to Robert did not exist, he had "found some supporting things" allowing him to determine the reason for the wire transfer.[17]  Stokes also stated that he did not have any documents to show how the amounts wired to Robert had been calculated and that he had based the calculations on his own recollection.  Stokes admitted that in his answer to an interrogatory asking if he had received money from any party during the past twelve months, he did not indicate that he received either $57,000 or $100,000 from Robert.  Furthermore, Stokes said that he did not take the lawsuit seriously until one month before trial, when he "went back to the facts as hard as [he] could."

## J.  Robert

Portions of Robert's deposition were played for the jury during Burris's case-in-chief. In it, Robert testified that in October 2005, Burris contacted him regarding the sale of the Robinson Ranch.  Burris told Robert "that [Burris] was going to be the listing agent of the property and [Thedford] was going to give [Robert] a shot at selling the property to [Braman]."  At this time, Robert was "still operating under [Puckett Ranch Real Estate]." On April 19, 2006, he "moved his license to Ranchbuyers Realty Service."

Robert told Burris and Thedford that Stokes "was helping him sell the property."

---

[17] The trial court ordered Stokes to produce any documents that he used to refresh his memory. However, on re-direct examination, Stokes explained that there were no documents to produce because when he referred to documents, "[he was] referring to facts that [he] uncovered that refresh [his] memory during this week."  There are no documents from Stokes in the record showing how he calculated the amount of the wire transfer to Robert.

Thedford and Burris were aware that Robert represented Braman. When asked if Thedford believed that Stokes was also representing Braman, Robert stated that he did not "know what [Thedford] was thinking."

Robert "didn't really look at [the Confidentiality Agreement] before [he] signed it" and he did not see the line stating that he agreed to protect Burris's interest. However, Robert believed that Burris would share a commission paid by the seller if Robert found a buyer through Stokes or anyone else.

Robert did not receive a portion of the commission, but Stokes gave him a "finder's fee" of $50,000 for the sale to SMZ. Robert received a commission on the second sale; he did not recall the exact amount but thought it was "between half a million and $700,000." Robert stated that he tried to hide the fact that Braman was not interested in the property from Thedford and Burris; however, Robert then denied that he concealed that from them. Robert then clarified that his answer was "Kind of yes and no." Robert could not explain his answer. Robert did not remember whether he told Thedford or Burris that Braman was no longer interested in purchasing the property.

On direct examination, Robert testified that although Braman stated he was not interested in the Robinson Ranch once he discovered the mineral rights would not be sold, Braman still wanted to know the asking price. Robert said that he had sold other property to Braman even after Braman had indicated he was not interested. However, on cross-examination, Robert conceded that Braman did not ask Robert to find out the sale price of the property. Robert stated that a client may tell him "no" on numerous occasions, but that he would still continue asking because he is a salesman.

When Robert signed the "Confidentiality Agreement," Burris did not tell him to

16

provide the appraisals only to Braman. Robert's "understanding of the confidentiality agreement was that [he] couldn't take the, whatever materials that he gave me to an unqualified purchaser and your general whatever; that it would have to be a qualified buyer." Robert testified that such a requirement is a "normal restriction" contained in a confidentiality agreement. Robert informed Burris that he would be moving his license to Ranchbuyers.com in the near future; in fact, within the next two or three weeks, Robert became licensed "under Ranchbuyers.com." Robert asked Burris to send a copy of the appraisals to Stokes. Robert showed Braman the appraisals, and Braman was not interested in the property, but still wanted to know the asking price. Robert stated that he did not know Braman would not purchase the property until Stokes made the thirty-million-dollar offer, which was "too rich" for Braman. Robert explained that the $649,500 wire transfer from Stokes included Robert's commission for the second sale of $360,000 and $57,000 in reimbursements. Stokes informed Robert that the balance of the amount was for commission on the sale of property in other transactions. However, when Robert testified, he could not provide an accurate accounting of the $649,500, and stated that plaintiff's counsel should ask Stokes for that information.

### III. BURRIS'S RIGHT TO A COMMISSION

By his first issue, Stokes argues that Burris did not have a "right" to the commission because "he did not represent any 'person' that would be paying a commission, rebate, or fee." However, the issue at trial was merely whether Stokes and Robert agreed to share any commission made on the sale of the Robinson Ranch with Burris, regardless of which party paid it. Therefore, in order to sustain this issue, we must conclude that a broker or agent may not agree to divide his or her commission with any broker or agent who does

17

not represent a party in the transaction. We decline to do so.

Stokes provides no authority and we find none supporting a conclusion that Stokes and Robert were barred from agreeing to share their commission with Burris because he may not have had a client in the transaction.[18] Based on the record before us, we cannot conclude that Stokes and Robert were prohibited from agreeing to share their commission with Burris, even if Burris did not represent either the seller or the buyer in this transaction. Furthermore, we note that there was evidence presented at trial that it is customary for real estate agents and brokers to agree to share their commission with others who did not represent a party in the transaction. At trial, Klutts testified that Friend, the SMZ's representative, agreed to share her commission with Klutts, even though he did not have a client in the transaction. The evidence also supports a finding that Stokes himself did not represent a client in the second sale of the property, but was still allowed to share in the commission. In fact, Klutts testified that Stokes did not represent either the seller or the buyer in the second sale, but Klutts and Friend still shared the commission from that sale with Stokes.[19] Moreover, there is nothing in the record to indicate that Robert represented either the seller or the buyer in the second transaction; nonetheless, Stokes testified that he shared his commission from the second sale with Robert. We overrule Stokes's first

---

[18] *See Moore v. Sussdorf*, 421 S.W.2d 460, 465 (Tex. Civ. App.–Tyler 1967, writ ref'd n.r.e.) ("It is generally held that an agreement between brokers to work together and share a commission on consummation of a deal constitutes a joint adventure and is enforceable."); *Miller v. Watson*, 257 S.W.2d 839, 841 (Tex. Civ. App.–Dallas 1953, writ ref'd n.r.e.) (allowing a broker who had an agreement to "work with or cooperate with" another broker to collect half of the commission paid to the defendant).

[19] According to Klutts, in the second sale, Friend represented SMZ, and Klutts brought in the buyer. The two shared two percent of the commission and Stokes received two percent of the commission. When asked why Stokes was allowed to share in the commission, Klutts replied, "I guess I should have thought about that more, but [Stokes] met with me. . . . And [Stokes] drove us [Klutts and the buyer] around in his car and explained all the details as to the workings of the ranch and getting this done. . . . And I know it looks like we probably could have just gotten together and not used [Stokes]. But [Stokes] was working real hard at the time on the first deal. . . ."

18

issue.

Stokes, by his second issue, and Puckett by a sub-issue also argue that if Burris violated the Real Estate License Act ("RELA"), he is precluded from collecting a commission. Specifically, appellants allege Burris violated section 535.148 of title 22 of the administrative code, and therefore any agreement to split a commission with Burris is unenforceable.[20]

In *Henry S. Miller Co. v. Treo Enterprises*, a case interpreting the statute of frauds provision of RELA, which does not apply to an agreement between real estate agents and brokers, the court of appeals concluded that "[s]trict compliance with the terms of [RELA] is required if a broker is to use the courts to recover his commissions."[21] The statute relied on by that court specifically stated:

> *A person may not bring or maintain an action for the collection of compensation for the performance in this state of an act set forth in Section 2 of this Act* without alleging and proving that the person performing the brokerage services was a duly licensed real estate broker or salesman at the time the alleged services were commenced, or was a duly licensed attorney at law in this state or in any other state.[[22]]

In *Trammel Crow Co. No. 60 v. Harkinson*,[23] the supreme court, citing former article 6573a, section 20(b)[24] of the Texas Revised Civil Statutes, concluded that to be enforceable, a

---

[20] *See* 22 TEX. ADMIN. CODE § 535.148 (2009) (Tex. Real Estate Comm'n, Receiving an Undisclosed Commission or Rebate).

[21] 573 S.W.2d 553, 555 (Tex. Civ. App.–Texarkana 1978), *aff'd*, 585 S.W.2d 674 (Tex. 1979).

[22] *Id.* at 554 (citing TEX. REV. CIV. STAT. art. 6573a § 20(a) (Vernon Supp. 1978)) (emphasis added).

[23] 944 S.W.2d 631, 633 (Tex. 1997).

[24] The Court in *Trammel Crow* cites the former version of RELA, before the Act's repeal and recodification in the occupations code. *See* TEX. OCC. CODE ANN. § 1101.806(a)(1) (Vernon 2004). Although the current section has undergone some changes, it is materially identical to the former version. *See* TEX. REV. CIV. STAT. ANN. art. 6573a, § 20(b) (Vernon Supp. 1997) (repealed 2003) (current version at TEX. OCC. CODE ANN. § 1101.806(c)).

19

commission agreement must be in writing and that section 20(b) precluded enforcement of an oral contract to recover a commission.[25]  Section 20(b), cited by the supreme court, specifically stated:

> *An action may not be brought in a court in this state for the recovery of a commission for the sale or purchase of real estate unless* the promise or agreement on which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged or signed by a person lawfully authorized by him to sign it.[26]

However, section 535.148 does not contain the language found in the statute relied on by the supreme court in *Trammel* that specifically prohibited maintaining a cause of action if the statute was not fully satisfied.

Appellants, relying on *Perl v. Patrizi*, urge us to conclude that a broker's failure to comply with section 535.148 of title 22 of the administrative code makes any agreement with other brokers or agents to share a commission unenforceable.[27]  We decline to do so. In *Perl*, the Texarkana Court of Appeals held that a contract was unenforceable because it failed to comply with a former version of section 535.148 that provided that "[e]very listing contract or other contract in which the licensee agrees to perform services for which a license is required must have a definite termination date, upon which date the listing or other contract will automatically expire without any requirement of notice to the real estate

---

[25] We note that section 1101.806 of the occupations code requires that in order to maintain a cause of action to collect a commission for the sale of real estate, the commission agreement must be in writing. *See* TEX. OCC. CODE ANN. § 1101.806(c).  However, section 1101.806 does not "apply to an agreement to share compensation among license holders."  *See id.* § 1106.806(a)(1); *Warren v. White*, 143 Tex. 407, 185 S.W.2d 718, 720 (1945); *see also Insignia Capital Advisors, Inc. v. Stockbridge Corp.*, No. 05-99-01126-CV, 2000 Tex. App. LEXIS 1649, at *9 (Tex. App.–Dallas Mar. 13, 2000, no pet.) (mem. op.).  License holders are defined as a broker or salesperson of real estate.  *See* TEX. OCC. CODE ANN. § 1101.002 (Vernon 2004).

[26] *Trammel Crow*, 944 S.W.2d at 631.

[27] *See* TEX. ADMIN. CODE § 535.148; *Perl v. Patrizi*, 20 S.W.3d 76, 80 (Tex. App.–Texarkana 2000, pet. denied).

licensee."[28]  However, the Houston Court of Appeals in *Northborough Corporate Limited Partnership, L.L.P. v. Cushman & Wakefield of Texas, Inc.*, declined to follow the Texarkana court's holding.[29]  Instead, the *Northborough* court concluded that even had there been a violation of a rule leading to the revocation or suspension of the broker's license, the violation would not necessarily void a contract.[30]  We agree with the court's reasoning in *Northborough*.

Section 535.148, part of a subchapter, entitled "Suspension and Revocation of Licensure," allows the Texas Real Estate Commission to suspend or revoke a broker's license if the broker or agent fails to disclose to his or her client an intention to receive a commission from another party or fails to gain his client's consent to do so.[31]  Specifically, it states in part as follows:

> A licensee may not receive a commission, rebate, or fee in a transaction from a person other than the person the licensee represents without first disclosing to the licensee's client that the licensee intends to receive the commission, rebate or fee, and obtaining the consent of the licensee's client. This subsection does not apply to referral fees paid by one licensed real estate broker or salesperson to another licensed broker or salesperson.[[32]]

Section 535.148, like the rule relied on by the *Perl* court, "has nothing to do with the enforceability of a broker's commission agreement.  Instead, it relates solely to the suspension or revocation of a broker's real estate license."[33]  Furthermore, nothing in

---

[28] *Perl*, 20 S.W.3d at 79.

[29] *Northborough Corporate, Ltd. P'ship v. Cushman & Wakefield of Tex., Inc.*, 162 S.W.3d 816, 820-821 (Tex. App.–Houston [14th Dist.] 2005, no pet.).

[30] *See id.*

[31] *See* 22 TEX. ADMIN. CODE § 535.148.

[32] *Id.* § 535.148(a).

[33] *See Northborough Corporate, Ltd. P'ship*, 162 S.W.3d at 821.

21

section 535.148 "references a broker's ability to maintain a cause of action."[34] The supreme court noted in *Trammel Crow* that it could not ignore the legislature's "unequivocal expression of intent set out in section 20(b) . . . [that] 'a broker may not recover a commission unless the commission agreement is in writing and signed by the party to be charged.'"[35] However, we do not find the same mandate in section 535.148.

Moreover, the *Perl* court concluded that by including the word "must" in the former version of section 535.148, the legislature intended that a contract have a termination date as a condition precedent to its enforcement.[36] The provision considered by the *Perl* court stated, "Every listing contract or other contract in which the licensee agrees to perform services for which a license is required *must* have a definite termination date, upon which date the listing or other contract will automatically expire without any requirement of notice to the real estate licensee."[37] Here, the rule cited by appellants does not contain language indicating that notifying a client of the intent to split or share a commission with another, or gaining the client's consent to do so, is a condition precedent to enforcement of an agreement between brokers or agents to share a commission. We cannot conclude that a broker's or agent's failure to inform his client of his intent to share or split a commission paid by one party with other brokers or agents or to obtain consent from his client to do so, renders such a contract unenforceable. We overrule Stokes's second issue and Puckett's sub-issue contending that an agreement to split or share the commissions was

---

[34] *See id.*

[35] *Trammel Crow*, 944 S.W.2d at 635.

[36] *Perl*, 20 S.W.3d at 80.

[37] *Id.*

22

unenforceable.[38]

## IV. SUFFICIENCY OF THE EVIDENCE

Puckett[39] and Stokes[40] challenge the legal and factual sufficiency of the evidence supporting the jury's finding of fraud.

## A. Standard of Review

We may sustain a challenge to a jury finding based on legal sufficiency only when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rule of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence provided to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.[41] "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence."[42] More than a scintilla of evidence exists if the evidence rises to

---

[38] Because we have overruled this issue, we need not address appellants' allegation that Burris cannot recover for breach of contract and the benefit of the failed bargain through a fraud claim because he violated rule 535.148. *See* TEX. R. APP. P. 47.1.

[39] Specifically, Puckett contends the evidence is legally and factually insufficient to support: (1) the fraud elements of materiality and detrimental reliance; (2) that the fraud proximately caused the damages awarded; (3) "the existence of a legally enforceable agreement to share commissions on the sale of the Robinson Ranch with [Burris] regardless of where the commission came from"; (4) a finding that Burris "did not fail" to "disclose to his client that he intended to receive a commission from a person other than his client or . . . to obtain the consent of his client to do so"; (5) the amount of damages awarded; (6) the jury's conspiracy finding; (7) "the jury's finding of justifiable reliance"; and (8) that "the negligent misrepresentation found by the jury proximately caused $417,500.00 in damages."

[40] Specifically, Stokes contends there is legally and factually insufficient evidence: (1) that "Stokes/CBM proximately caused Burris' alleged damages under any theory"; (2) of detrimental reliance; (3) "to support recovery for breach of contract against Stokes/CBM"; and (4) that "Stokes/CBM committed fraud, conspired to commit fraud, or made any negligent misrepresentation to Burris."

[41] *City of Keller v. Wilson*, 168 S.W.3d 802, 810-11 (Tex. 2005).

[42] *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

23

a level that would enable reasonable and fair-minded people to differ in their conclusions.[43]

In our legal sufficiency review, we review the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not.[44] The final test for legal sufficiency is whether the evidence presented at trial would enable reasonable and fair-minded people to make the finding under review.[45]

When reviewing a jury finding for factual sufficiency, we consider and weigh all of the evidence in a neutral light and conclude that the finding is not supported by sufficient evidence only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.[46] We must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict."[47]

## B. Discussion

At trial, Burris alleged that Stokes and Robert represented to him that they would share a commission with him on the sale of the Robinson Ranch but failed to do so. Burris claimed that their failure to perform caused him damages—the loss of the commission. The jury agreed and found that Stokes and Robert had committed a fraud that caused Burris's damages.

---

[43] *Id.*

[44] *City of Keller*, 168 S.W.3d at 807.

[45] *Id.* at 827.

[46] *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

[47] *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).

To recover on a cause of action for fraud, a party must show: "(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury."[48]

In the charge, the trial court instructed the jury that a misrepresentation means "[a] promise of future performance made with an intent, at the time the promise was made, not to perform as promised."[49] For a promise of future performance to be the basis of actionable fraud, it must have been false at the time it was made.[50] "Failure to perform, standing alone, is no evidence of the promisor's intent not to perform when the promise was made. However, that fact is a circumstance to be considered with other facts to establish intent."[51] The jury may infer intent from the party's subsequent acts after the representation is made.[52] "'Slight circumstantial evidence' of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent."[53]

The jury found that Stokes and Robert agreed to split or share any commission

---

[48] *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 211 n.45 (Tex. 2002) (quoting *In re FirstMerit Bank*, 52 S.W.3d 749, 758 (Tex. 2001)).

[49] *See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998) ("A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made.") (citing *Schindler v. Austwell Farmers Coop.*, 841 S.W.2d 853, 854 (Tex. 1992) (per curiam)).

[50] *Schindler*, 841 S.W.2d at 854.

[51] *Id.* (quoting *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986)).

[52] *Spoljaric*, 708 S.W.2d at 434.

[53] *Id.* at 435.

made on the sale of the Robinson Ranch with Burris.[54] Burris testified that he had an agreement to share a commission on the sale of the Robinson Ranch with Robert "from the beginning." He assumed that they would split the commission fifty-fifty. Robert testified he believed that he and Burris would share a commission paid by the seller if Robert found a buyer through Stokes or anyone else. Stokes believed that he had an agreement with Burris to share a six percent commission only if it was paid by the seller. However, Stokes argues that the evidence is legally and factually insufficient to support a finding that he agreed to share a commission with Burris regardless if it was paid by the buyer or the seller. Stokes testified that he had an agreement to share a commission with Burris, but he asserted that the agreement terminated when the sellers refused to pay it.

---

[54] In a sub-issue, Stokes argues that at trial, Burris "judicially admitted" that he did not have an agreement with Stokes when his counsel stated in closing argument:

> The second part of this—of this request Question No. 1 basically deals with whether the agreement between [Burris] and Robert binds [Stokes]. And we talked about two ways in those instructions that he could be bound.

> One way is through apparent authority. This part right here. The other way is if that party ratifies the agreement.

According to Stokes, by making these comments, "[a]ny finding the jury may have tried to make that an agreement existed directly between Stokes/CBM and Burris and that such agreement was breached (Question 3) contravenes Burris' own judicial admission." We disagree. A judicial admission "bars the party admitting the fact from later disputing its existence." *Medina v. Hart*, 240 S.W.3d 16, 23 (Tex. App.–Corpus Christi 2007, pet. denied). Here, by explaining to the jury that Question 1 included theories of ratification and agency as binding Stokes to the agreement, Burris did not "admit" that Stokes did not agree to split his commission with him. A statement regarding a theory of liability based on ratification or agency by counsel during argument was not an admission that Stokes did not agree to split the commission with Burris. *See Price Pfister, Inc. v. Moore & Kimmey, Inc.*, 48 S.W.3d 341, 349 (Tex. App.–Houston [14th Dist.] 2001, pet. denied) (stating that to be a judicial admission, attorney's statement in closing argument must be "a clear, deliberate, and unequivocal statement"). Furthermore, a judicial admission must be "contrary to an essential fact embraced" by Burris. *See Medina*, 240 S.W.3d at 23. Here, Burris argued that Stokes was liable for breaching a contract with him. A theory that Stokes was bound by the agreement through an agency theory or by ratification would not be contrary to any essential fact embraced by Burris—that Stokes agreed to share his commission with him. Finally, for a statement to constitute a judicial admission, it must be destructive of the opposing party's theory. *See id.* Here, Stokes's theory was that he had an agreement to split a commission with Burris if paid by the seller, but not if paid by the buyer. Whether Stokes's agreement was based on an agency theory or on a ratification theory does not destroy Stokes's theory of defense. We overrule Stokes's sub-issue.

26

Burris testified that he believed he had a verbal agreement with Stokes and Robert entitling him to fifty percent of a commission on the sale of the property even if it was paid by the buyer. The jury believed Burris.[55] It is undisputed that Stokes did not split the commission with Burris.

Burris presented evidence that Stokes and Robert continued to tell him that Braman was the buyer even though Braman was no longer interested. Robert told Thedford that Stokes was going to help Robert present the sale opportunity to Braman. According to Thedford, neither Stokes nor Robert informed him that Stokes did not represent Braman, Braman was not interested in purchasing the property, or SMZ was presenting an offer. Thedford did not find out that Braman did not purchase the property until after the "final contract had already been signed." Thedford made it clear to Stokes and Robert that the sellers wanted to give Braman the first opportunity to purchase the property. Burris stated that he would have found another buyer if he had known that Braman was not interested. Hartnett testified that he would have dealt with SMZ differently had he known it was not Braman making the offer to purchase the property. Hartnett stated that he would not have entered an exclusive agreement to sell the property with SMZ had he known that Braman was not making the offer, and he would have tried to "pit" other buyers against each other. From this evidence, the jury may have reasonably inferred that Stokes and Robert made a material misrepresentation to Burris.

Burris testified that once he believed that he had an agreement with Stokes and Robert to split a commission, he provided confidential information—the appraisals of the

---

[55] *See Dillard Dep't Stores, Inc. v. Silva*, 148 S.W.3d 370, 372 (Tex. 2004) ("[W]hen testimony is contradictory, credibility is for the fact finder to decide.") (citing *Jones v. Tarrant Util. Co.*, 638 S.W.2d 862, 866 (Tex. 1982)) (per curiam).

property—to them and did not pursue other buyers. Robert signed the confidentiality agreement before Burris provided the appraisals to him and Stokes. When he signed the agreement, Robert indicated that Stokes was his partner. Burris testified that he intended to protect his rights to the commission in the confidentiality agreement. Robert stated that he did not read the document before signing it. There is a clause in the confidentiality agreement stating that Burris's rights were to be protected. Burris explained that his rights included a right to share in the commission. Burris testified that he edited the confidentiality agreement to show that Ranchbuyers.com held Robert's license upon Robert's request. Robert told Thedford that Stokes "[did] all the contracts and everything for [Robert]." Burris testified that he would not have provided the appraisals to Robert or Stokes had he been aware that they did not intend to share the commission with him. Furthermore, if Burris had known that Stokes and Robert had not intended to share a commission with him, he would have stopped dealing with Stokes and Robert.

In Question 7, the jury was asked, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [Burris] for his damages, if any that were proximately caused by such fraud?" The jury answered "$362,500." Proximate cause was defined in the charge as "that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred." The jury was asked to "consider the following element of damages . . . and none other: The sum of money, if any, that [Burris] would have received if the fraud had not taken place." The sum of money that Burris would have received if Stokes and Robert had not committed the fraud was $362,500—half of the commission that Stokes received from SMZ

28

on the sale of the Robinson Ranch.[56]

The jury agreed with Burris and found that Stokes and Robert committed fraud. Based on the evidence presented at trial, the jury could have reasonably believed that: (1) there was an agreement to split a commission on the sale of the Robinson Ranch with Burris; (2) in reliance upon that agreement, Burris acted and was instrumental in providing information to Stokes and Robert that assisted them in selling the property to SMZ; (3) at the time Stokes and Robert agreed to share a commission with Burris, they did not intend to do so; (4) by their conduct and representations, Stokes and Robert concealed that intent from Burris; and (5) by their failure to share the commission with Burris, he suffered injury in the amount of $362,500.

Viewing the evidence in the light favorable to the jury's finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not, we conclude that there is some evidence supporting each element of the jury's finding of fraud.[57] Thus, we conclude that Burris presented legally sufficient evidence that Stokes and Robert made representations with no intention of performing as represented in order to induce Burris to continue providing confidential information to them and to not pursue selling the property to another prospective

---

[56] Appellants argue that there is insufficient evidence to support a finding that Robert "ever realized a commission on the sale of the ranch to SMZ, and the jury rejected Burris' [sic] argument that he is entitled to a share of the commission on the subsequent sale." However, no question regarding whether Robert received a commission on the sale of the property to SMZ or whether Burris was entitled to a share of the commission on the second sale was submitted to the jury. Therefore, we do not address appellants' argument as it is not dispositive of this appeal. *See* TEX. R. APP. P. 47.1. Furthermore, the jury heard evidence that Robert received between $500,000 and $700,000 as commission on the sale of the property and that Stokes wired $649,500 after the closing on the sales—a total of roughly half of Stokes's commission on both sales. Based on this evidence, the jury could have rationally inferred that Stokes shared his commission with Robert on both sales.

[57] *See City of Keller*, 168 S.W.3d at 807.

29

purchaser.[58]  Furthermore, after considering and weighing all of the evidence in a neutral light, we conclude that the finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.[59]  We overrule appellants' challenge to the legal and factual sufficiency of the evidence supporting a finding of fraud.[60]

Finally, by a sub-issue, appellants argue that Robert did not receive a commission on the sale of the Robinson Ranch to SMZ.  However, there was evidence that Robert received a wire transfer of $649,500 and Robert stated during his deposition that he received between half a million dollars and $700,000 from the sale of the Robinson Ranch. Neither Stokes nor Robert could account for the $700,000; if Robert was only entitled to half of the commission on the second sale, he would have received $360,000.  The jury was free to disbelieve Stokes's testimony that he had, based on his own recollection and without documentary evidence, somehow calculated the extra amount as including expenses owed to Robert, the finder's fee of $55,000, commission from other sales, and money Robert asked Stokes to hold for him.  We overrule appellants' sub-issue.

## V. Joint and Several Liability

By their final issue, appellants contend that there is legally and factually insufficient evidence to support the jury's finding that Robert and Stokes were "part of a conspiracy to commit fraud."  Based on this finding, the trial court held Stokes and Puckett jointly and

---

[58] *See id.*

[59] *See Cain*, 709 S.W.2d at 176.

[60] Stokes also argues that there was insufficient evidence to support the jury's finding that there was fraud by non-disclosure.  The charge allowed the jury to find that Stokes committed fraud if he made a material misrepresentation or if he failed to disclose a material fact within his knowledge.  Because we have already concluded that there was legally and factually sufficient evidence to support the jury's finding of fraud based on Stokes's misrepresentation that he would split the commission with Burris, we do not reach this issue.  *See* Tex. R. App. P. 47.1.

30

severally liable for Burris's damages.

Puckett argues that the evidence was insufficient to support the following elements of conspiracy: (1) that the combination of two persons was to commit an unlawful purpose or a lawful purpose by unlawful means; (2) the members of the conspiracy had a meeting of the minds on the object or course of action; (3) one of the members of the conspiracy committed an unlawful, overt act to further the object or course of action; and (4) the plaintiff suffered injury as a proximate result of the wrongful act.[61]  However, the jury was not instructed on these elements of conspiracy.  Instead, the jury was instructed to find a conspiracy if: (1) Stokes and Robert "had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to [Burris]"; and (2) a member of the conspiracy "performed some act or acts to further the conspiracy."

"The sufficiency of the evidence must be measured by the jury charge when, as here, there has been no objection to it."[62]  Therefore, we must review the sufficiency of the evidence in light of the instructions given to the jury.  There was evidence that Stokes and Robert agreed to split a commission with Burris but did not intend to perform as promised when they made the agreement.  Furthermore, evidence was presented that Stokes wired almost $650,000 to Robert after the property was sold and re-sold; however, Stokes claimed that Robert only received a $50,000 finder's fee.  The jury did not believe Stokes and must have believed that Robert received half of Stokes's commission on both sales of the property.  From this evidence and the evidence detailed above, the jury may have

---

[61] *Jenkins v. Entergy Corp.*, 187 S.W.3d 785, 797 n.10 (Tex. App.–Corpus Christi 2006, no pet.) (citing *Chon Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005)).

[62] *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005).

reasonably inferred that Stokes and Robert had knowledge of, agreed to and intended the common objective or course of action of committing the fraud against Burris that resulted in the damages. [63]  Furthermore, the jury may have reasonably found that Stokes, Robert, or both performed some act or acts to further the conspiracy.[64]  Therefore, after reviewing the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not, we conclude that there is legally sufficient evidence to support the jury's finding of a conspiracy under the instructions provided.[65]  Furthermore, after considering and weighing all of the evidence in a neutral light, we conclude the finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.[66]  Because the evidence is legally and factually sufficient to support the jury's finding of a conspiracy, the trial court did not err in holding Stokes and Puckett jointly and severally liable for Burris's damages.[67]  We overrule appellants' final issue.

## VI. CONCLUSION

Having overruled appellants' challenge to the legal and factual sufficiency of the

---

[63] *See Central Sav. & Loan v. Stemmons Nw.*, 848 S.W.2d 232, 241 (Tex. App.–Dallas 1992, no writ) ("The gist of a civil conspiracy is the damage resulting from commission of a wrong that injures another and not the conspiracy itself.").

[64] *See Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 95 (Tex. App.–Houston [14th Dist.] 2004, no pet.) (" It is well-settled law that upon joining a conspiracy, a defendant becomes a party to every act previously or subsequently committed by any of the other conspirators in pursuit of the conspiracy.") (citing *State v. Standard Oil Company*, 130 Tex. 313, 107 S.W.2d 550, 560 (1937); *Bourland v. State*, 528 S.W.2d 350, 354 (Tex. Civ. App.–Austin 1975, writ ref'd n.r.e.).

[65] *See City of Keller*, 168 S.W.3d at 807.

[66] *See Cain*, 709 S.W.2d at 176.

[67] *See Smith v. Caldwell*, 754 S.W.2d 692, 693-94 (Tex. App.–Houston [1st Dist.] 1987, orig. proceeding) ("All conspirators are jointly and severally liable for wrongful acts done in furtherance of the conspiracy.").

evidence supporting a finding of fraud and conspiracy, we need not address appellants' issues challenging the jury's findings of breach of contract and negligent misrepresentation.[68]  We affirm the trial court's judgment.


_____
LINDA REYNA YAÑEZ,
Justice

Delivered and filed
the 24th day of November, 2009.

---

[68] *See* TEX. R. APP. P. 47.1.